IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

No. 13-3253

Criminal

UNITED STATES OF AMERICA,

Appellee,

v.

FRED ROBINSON,

Appellant.

Appeal from the United States District Court
Eastern District of Missouri
District Court No. 4:11CR361-AGF

The Honorable Audrey G. Fleissig,
United States Judge, Presiding

**ADDENDUM TO BRIEF OF APPELLANT**

DIANE DRAGAN
FELICIA JONES
Assistant Federal Public Defenders
1010 Market Suite 200
St. Louis, Missouri 63101
(314) 241-1255
ATTORNEYS FOR APPELLANT

# TABLE OF CONTENTS

1)     Judgment entered September 17, 2013, No. 4:11CR361 JCF............. 1-8

2)     Magistrate's Order & Recommendation (DCD#83) .......................9-49

3)     District Court Order on Pretrial Motions (DCD#148)....................50-84

4)     District Court Order on Pretrial Motions (DCD#227)................... 85-119

5)     Defendant's Exhibit K-1 (Informational Chart of Government Offices in St. Louis ................................................................................. 120

6)     Richard Frank testimony regarding Exhibit K (Tr-Vol-6 141-145)...121-125

7)     Challenged lay opinion testimony on agency (Tr-Vol-6  163)...............126

8)     Richard Frank Redirect explaining premise of opinion (Tr-Vol-6 165)... 127

9)     Government's Rebuttal Summation regarding agency (Tr-Vol-7 87).…....128

10)     Agent Comeau Suppression Hearing Excerpt (DCD#86 at 31-32)....129-130

11)     Denied Defense Instructions C.................................................. 131

12)     Dendied Defense Instructions D and E …..…...................…...........132

AO 245B (Rev. 09/12)

Sheet 1- Judgment in a Criminal Case

# United States District Court
### Eastern District of Missouri

UNITED STATES OF AMERICA

v.

Fred W. Robinson

**JUDGMENT IN A CRIMINAL CASE**

CASE NUMBER:  4:11CR361 AGF

USM Number:  38950-044

Diane Dragan and Felicia A. Jones
Defendant's Attorney

THE DEFENDANT:

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s) 
which was accepted by the court.

☒ was found guilty on count(s)  one (1) through eight (8) on March 26, 2013
after a plea of not guilty

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. § 1343 | Wire Fraud | November 10, 2010 | one (1) |
| 18 U.S.C. § 666(a)(1)(A) | Federal Program Theft | April 30, 2010 | two (2) |
| 18 U.S.C. § 666(a)(1)(A) | Federal Program Theft | April 30, 2011 | three (3) |

The defendant is sentenced as provided in pages 2 through __7__ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____   dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

September 17, 2013

Date of Imposition of Judgment

Signature of Judge

United States District Judge
Audrey G. Fleissig
Name & Title of Judge

September 17, 2013

Date signed

Record No.  651

1

Appellate Case: 13-3253    Page: 3    Date Filed: 02/12/2014 Entry ID: 4123547

AO 245B (Rev. 09/11)   Sheet 1A - Judgment in a Criminal Case

DEFENDANT: Fred W. Robinson

CASE NUMBER: 4:11CR361 AGF

District:   Eastern District of Missouri

Judgment-Page ___2___ or ___7___

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 666(a)(1)(A) | Federal Program Theft | December 31, 2006 | four (4) |
| 18 U.S.C. § 666(a)(1)(A) | Federal Program Theft | December 31, 2007 | five (5) |
| 18 U.S.C. § 666(a)(1)(A) | Federal Program Theft | December 31, 2008 | six (6) |
| 18 U.S.C. § 666(a)(1)(A) | Federal Program Theft | December 31, 2009 | seven (7) |
| 18 U.S.C. § 666(a)(1)(A) | Federal Program Theft | December 31, 2010 | eight (8) |

2

Appellate Case: 13-3253   Page: 4   Date Filed: 02/12/2014 Entry ID: 4123547

AO 245B (Rev. 09/12)       Judgment in Criminal Case       Sheet 2 - Imprisonment

Judgment-Page ___3___ of __7__

DEFENDANT: Fred W. Robinson
CASE NUMBER: 4:11CR361 AGF
District:  Eastern District of Missouri

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of  24 months

This term consists of a term of 24 months on each of counts one through eight, all such terms to be served concurrently.

☒ The court makes the following recommendations to the Bureau of Prisons:

It is recommended that the defendant participate in the Financial Responsibility Program while incarcerated, if that is consistent with Bureau of Prisons policies. It is further recommended that the defendant be evaluated for a medical facility as close to St. Louis, Missouri as possible if this is consistent with the Bureau of Prisons policies.

☐ The defendant is remanded to the custody of the United States Marshal.

☒ The defendant shall surrender to the United States Marshal for this district:

  ☐ at _____ a.m./pm on _____

  ☒ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

  ☐ before 2 p.m. on _____

  ☐ as notified by the United States Marshal

  ☐ as notified by the Probation or Pretrial Services Office

## MARSHALS RETURN MADE ON SEPARATE PAGE

3

AO 245B (Rev. 09/ 2)    Judgment in Criminal Case    Sheet 3 - Supervised Release

Judgment—Page __4__ of __7__

DEFENDANT: Fred W. Robinson
CASE NUMBER: 4:11CR361 AGF
District:    Eastern District of Missouri

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of __3 years__

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☒ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☒ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

☒ The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐ The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. (Check, if applicable.)

☐ The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment

The defendant shall comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

4

AO 245B (Rev. 09/12)  Judgment in Criminal Case  Sheet 3C - Supervised Release

Judgment—Page __5__ of __7__

DEFENDANT:  Fred W. Robinson
CASE NUMBER:  4:11CR361 AGF
District:  Eastern District of Missouri

## SPECIAL CONDITIONS OF SUPERVISION

While on supervision, the defendant shall comply with the standard conditions that have been adopted by this Court and shall comply with the following additional conditions. If it is determined there are costs associated with any services provided, the defendant shall pay those costs based on a co-payment fee established by the probation office.

1. The defendant shall participate in a cognitive behavioral treatment program as directed by the probation office.

2. The defendant shall provide the probation office and the Financial Litigation Unit (FLU) of the U.S. Attorney's Office access to any requested financial information. The defendant is advised that the probation office may share financial information with FLU.

3. The defendant shall be prohibited from incurring new credit charges or opening additional lines of credit without the approval of the probation office so long as there is a balance on the Court-imposed financial obligation.

4. The defendant shall apply all monies received from any anticipated and/or unexpected financial gains, including any income tax refunds, inheritances, or judgments, to the outstanding Court-ordered financial obligation. The defendant shall immediately notify the probation office of the receipt of any indicated monies.

5. The defendant shall pay the restitution as previously ordered by the Court.

6. The defendant shall not be self-employed or be employed as a "consultant" without the written permission of the probation office.

7. The defendant shall not create, operate, manage or participate in the creation, operation or management of any business entity, including a family business without the written permission of the probation office.

8. The defendant shall submit his person, residence, office, or vehicle to a search conducted by the probation office based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. The defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

Based on the low risk the defendant poses for future substance abuse, the COURT SUSPENDS the mandatory statutory drug testing requirements.

**Payments of restitution shall be made to the Clerk of the Court for transfer to the victims. The interest requirement for the restitution is waived.

All criminal monetary penalties are due in full immediately. The defendant shall pay all criminal monetary penalties through the Clerk of Court. If the defendant cannot pay in full immediately, then the defendant shall make payments under the following minimum payment schedule: During incarceration, it is recommended that the defendant pay criminal monetary penalties through an installment plan in accordance with the Bureau of Prisons' Inmate Financial Responsibility Program at the rate of 50% of the funds available to the defendant. If the defendant owes any criminal monetary penalties when released from incarceration, then the defendant shall make payments in monthly installments of at least $200, or no less than 10% of the defendant's gross earnings, whichever is greater, with payments to commence no later than 30 days after release from imprisonment. Until all criminal monetary penalties are paid in full, the defendant shall notify the Court and this district's United States Attorney's Office, Financial Litigation Unit, of any material changes in the defendant's economic circumstances that might affect the defendant's ability to pay criminal monetary penalties. The defendant shall notify this district's United States Attorney's Office, Financial Litigation Unit, of any change of mailing or residence address that occurs while any portion of the criminal monetary penalties remains unpaid.

5

AO 245B (Rev. 09/12)   Judgment in Criminal Case   Sheet 5 - Criminal Monetary Penalties

|  | Judgment-Page | 6 | of | 7 |

DEFENDANT: Fred W. Robinson
CASE NUMBER: 4:11CR361 AGF
District: Eastern District of Missouri

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on sheet 6

| | Assessment | Fine | Restitution |
| --- | --- | --- | --- |
| Totals: | $800.00 | | $419,333.00 |

☐ The determination of restitution is deferred until _____. *An Amended Judgment in a Criminal Case (AO 245C)* will be entered after such a determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
| --- | --- | --- | --- |
| City of St. Louis Treasurer's Office, Attn: Restituion L. Jared Boyd, Chief of Staff 133 S. 11th St., Suite 530, St. Louis, MO 63102 | | $176,800.00 | |
| Missouri Department of Elementary and Secondary Education, Attn: General Counsel, Mark A. Van Zandt, P.O. Box 480, 205 Jefferson St., Jefferson City, MO 65102 | | $242,533.00 | |
| | | | |
| Totals: | | $419,333.00 | |

☐ Restitution amount ordered pursuant to plea agreement _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☒ The interest requirement is waived for the.   ☐ fine   ☒ restitution.

☐ The interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994 but before April 23, 1996.

6

AO 245B (Rev. 09/12)   Judgment in Criminal Case      Sheet 6 – Schedule of Payments

Judgment—Page __7__ of __7__

DEFENDANT: Fred W. Robinson

CASE NUMBER: 4:11CR361 AGF

District:  Eastern District of Missouri

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A ☐ Lump sum payment of _____ due immediately, balance due

       ☐ not later than _____ , or

       ☐ in accordance with  ☐ C,  ☐ D, or  ☐ E below; or ☐ F below; or

B ☐ Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ E below; or ☐ F below; or

C ☐ Payment in equal _____ (e.g., equal, weekly, monthly, quarterly) installments of _____ over a period of
_____ e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D ☐ Payment in equal _____ (e.g., equal, weekly, monthly, quarterly) installments of _____ over a period of
_____ e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
term of supervision; or

E ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after Release from
imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time: or

F ☒ Special instructions regarding the payment of criminal monetary penalties:

IT IS FURTHER ORDERED that the defendant shall pay to the United States a special assessment of $100 on each of counts one through eight, for a total of $800,
which shall be due immediately.

Unless the court has expressly ordered otherwise, if this judgment imposes  imprisonment, payment of criminal monetary penalties is due
during the period of imprisonment. All criminal monetary penalty payments, except those payments made through the Bureau of Prisons'
Inmate Financial Responsibility Program are made to the clerk of the court.

The defendant will receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several
    Defendant and Co-defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
    and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1 ) assessment; (2) restitution principal, (3) restitution interest, (4) fine principal,
(5)fine interest (6) community restitution.(7) penalties, and (8) costs, including cost of prosecution and court costs.

7

Appellate Case: 13-3253     Page: 9     Date Filed: 02/12/2014 Entry ID: 4123547



DEFENDANT: Fred W. Robinson
CASE NUMBER:  4:11CR361 AGF
USM Number:  38950-044

## UNITED STATES MARSHAL
## RETURN OF JUDGMENT IN A CRIMINAL CASE

I have executed this judgment as follows:

_____

_____

_____

The Defendant was delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
Deputy U.S. Marshal

☐   The Defendant was released on _____ to_____ Probation

☐   The Defendant was released on _____ to_____ Supervised Release

☐   and a Fine of_____  ☐ and Restitution in the amount of_____

_____
UNITED STATES MARSHAL

By _____
Deputy U.S. Marshal

I certify and Return that on _____, I took custody of _____

at _____ and delivered same to _____

on _____ F.F.T. _____

U.S. MARSHAL E/MO

By DUSM _____

8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:11 CR 361 AGF / DDN |
| | ) | |
| FRED W. ROBINSON, | ) | |
| | ) | |
| Defendant. | ) | |

**SECOND PRETRIAL**
**ORDER AND RECOMMENDATION**

This action is before the court upon the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b).

Pending are the motions of defendant Fred W. Robinson to dismiss (Docs. 25, 52, 66), to sever (Docs. 26, 78), to suppress evidence (Docs. 27, 67), and for change of venue (Doc. 68), and the motion of the government for leave to present additional evidence relating to reasonable suspicion (Doc. 61). Pretrial hearings were held on December 1, 2011, February 17, 2012, and April 12, 2012.

On September 8, 2011, a grand jury returned an indictment against defendant Robinson charging him with eight counts. (Doc. 1.) Defendant filed motions to dismiss (Doc. 25), to sever Count I from the remaining counts (Doc. 26), and to suppress evidence (Doc. 27). On December 27, 2011, the undersigned issued a Report and Recommendation concerning those motions. (Doc. 36.) Thereafter, defendant filed another motion to dismiss. (Doc. 52.)

On February 13, 2012, the matter was referred back to the undersigned for a report and recommended disposition of the newly-filed motion to dismiss (Doc. 52) and a supplemental report and recommendation regarding defendant's motion to suppress (Doc. 27) in light of the Supreme Court's opinion in United States v. Jones.[1] (Doc. 54.) This Order and Recommendation replaces in its entirety the Report and

---

[1]132 S. Ct. 945 (2012).

9

Appellate Case: 13-3253   Page: 11   Date Filed: 02/12/2014 Entry ID: 4123547

Recommendation filed on December 27, 2011 (Doc. 36). This Order and Recommendation is founded upon the entire record of this action, including the evidence adduced upon which the original Report and Recommendation was based.[2]

On February 23, 2012, a grand jury returned a superseding indictment charging defendant Robinson with eight counts. (Doc. 57.) Thereafter, defendant filed motions to dismiss (Doc. 66), to suppress evidence (Doc. 67), for change of venue (Doc. 68), and to sever (Doc. 78).

Defendant Robinson is charged by the superseding indictment with eight counts of offenses:

**Count I** alleges that defendant was the Chairman of the Board of Trustees of the Paideia Academy (PA), a Missouri Charter School for grades K-8, which was sponsored by the Missouri University of Science and Technology. PA was a wholly-owned subsidiary of the Paideia Corporation (PC), a non-profit corporation. Defendant maintained an office at PA's administration building and was involved in the day-to-day operation of PA. PA was "funded by substantial Federal education funds and substantial Missouri education funds intended for legitimate school operations." (Doc. 57 at 1-2.)

**Count I** further alleges that defendant and a friend, Latasha P., organized and incorporated Paige C. Investments, LLC (Paige C), a Missouri company, for the purpose of operating a day care center, which was to be called The Little People's Academy (TLPA). Defendant and Latasha P. planned to operate TLPA in a building at 4028 West Florissant Avenue in St. Louis through Paige C. Defendant registered TLPA with the State of Missouri and listed his residence at 8726 Partridge Avenue, St. Louis, Missouri, as TLPA's business address. (Id. at 2.)

**Count I** further alleges that defendant, as Chairman of the PA Board of Trustees and in violation of PA's bylaws, directed that a resolution be passed by PA's Board of Trustees approving a $150,000.00 loan to TLPA for the acquisition and rehabilitation of the building located at 4028

---

[2]Thus, some findings of fact and conclusions of law found in the original Report and Recommendation are restated and some may be modified in this Order and Recommendation.

Appellate Case: 13-3253   Page: 12   Date Filed: 02/12/2014 Entry ID: 4123547

West Florissant Avenue, and for the operation of a day care center at that location.  In violation of PA's bylaws, defendant failed to advise PA's Board of Trustees of his material financial interest in the transaction, in that he was a co-owner of Paige C, which was going to operate TLPA.  (Id. at 3.)

Count I further alleges that on several occasions defendant subsequently directed, authorized, and approved the lending of substantial sums of PA's money to TLPA for the purpose of purchasing the property and rehabilitating the building at 4028 West Florissant Avenue. (Id. at 4.)

Count I further alleges that after the Missouri Department of Education determined not to approve PA's application to continue its state charter, defendant opened a bank account in the name of "Paideia Corporation, West Florissant Capital Improvement" (new bank account) and caused the transfer of PA federal and state funds to the new bank account.  Defendant, without the knowledge of the PA Board of Trustees, authorized the disbursement of PA state and federal funds from the new bank account for the construction and renovation of TLPA at 4028 West Florissant Avenue.  (Id. at 4-6.)

Count I further alleges that defendant failed to advise the federal and state governments that he had directed PA federal and state funds for the development of the building at 4028 West Florissant for TLPA.  None of the budgets submitted by PA, required by the Missouri Department of Elementary and Secondary Education, included funds for 4028 West Florissant or TLPA.  At no time did the United States Department of Education, the Missouri Department of Elementary and Secondary Education, or the Missouri University of Science and Technology approve or authorize the use of PA funds for 4028 West Florissant or TLPA.  (Id. at 6.)

Count I alleges that on September 15, 2009, to execute the above-described scheme, defendant knowingly caused a wire communication between PA in Missouri and Edvantage Partners in Arizona regarding a $25,000.00 invoice from Select Construction Services, LLC, for the development of the 4028 West Florissant building of TLPA, in violation of 18 U.S.C. §§ 1343 and 2.  (Id. at 6-7.)

Appellate Case: 13-3253   Page: 13   Date Filed: 02/12/2014 Entry ID: 4123547

**Counts II and III** allege, respectively, that between May 1, 2009 and April 30, 2010, and between May 1, 2010 and April 30, 2011, defendant, as Chairman of the Board of Trustees of PA, which organization had received more than $10,000.00 in federal funds during each respective year, misapplied at least $5,000.00 in property and funds of PA for the development of TLPA, in violation of 18 U.S.C. § 666(a)(1)(A). (Id. at 7-8.)

**Counts IV, V, VI, VII, and VIII** allege, respectively, that during each of the calendar years of 2006, 2007, 2008, 2009, and 2010, defendant, "being an agent of an organization, that is, the City of St. Louis as an employee of the [St. Louis City] Treasurer's Office," which received over $10,000.00 in federal funds during each calendar year, obtained approximately $35,360.00 in each of the alleged years from the Treasurer's Office by submitting false weekly time sheets falsely certifying work hours, each count in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2. (Id. at 9-12.)

## I.  MOTIONS TO DISMISS

Defendant Robinson moves to dismiss Counts IV-VIII from the superseding indictment, arguing that (1) § 666 is unconstitutional; (2) these counts fail to state an offense; and (3) the court lacks subject matter jurisdiction over these counts. (Docs. 25, 52, 66.)

The portion of § 666 relevant to the superseding indictment states:

(a) Whoever, if the circumstance described in subsection (b) of this section exists—

   (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

      (A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies property that—

         (i) is valued at $5,000 or more, and

         (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; []

- 4 -

12

Appellate Case: 13-3253   Page: 14   Date Filed: 02/12/2014 Entry ID: 4123547

. . .

... shall be [punished].

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

(c) This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

Section 666(a)-(c).

## A.   Constitutionality of § 666

Defendant Robinson argues that Congress exceeded its authority under the Commerce Clause of the Constitution when it passed 18 U.S.C. § 666. Specifically, defendant argues that § 666 does not substantially affect interstate commerce and as such, congressional jurisdiction is lacking under the Commerce Clause of the Constitution, citing United States v. Lopez[3] and Jones v. United States.[4]

The Supreme Court has recognized that the constitutional authority for Congress to enact § 666(a)(2) is not the Commerce Clause, but the Spending Clause and the Necessary and Proper Clause.   Sabri v. United States, 541 U.S. 600, 605-06 (2004).   In Sabri, the Court stated that Congress is authorized under these clauses of the Constitution to appropriate federal money for the general welfare, and has the corresponding authority to see that tax money is spent for the general welfare "and not frittered away in graft or on projects undermined when funds are siphoned off . . . ."   Id. at 605.   Both § 666(a)(1), alleged in the instant indictment, and (a)(2), at issue in Sabri, are cut from the same constitutional authority of Congress to protect federal funds from criminal dissipation.

---

[3]514 U.S. 549, 558 (1995).

[4]529 U.S. 848, 850-57 (2000).

- 5 -

13

Therefore, § 666(a)(1)(A) is constitutional.

**B.   Offenses Alleged in Counts IV-VIII**

Defendant Robinson also argues that Counts IV-VIII fail to allege offenses under 18 U.S.C. § 666(a)(1)(A).  The indictment must allege the essential elements of the offenses charged.  U.S. Const. amends. V and VI; Fed. R. Crim. P. 7(c)(1); Hamling v. United States, 418 U.S. 87, 117 (1974); United States v. White, 241 F.3d 1015, 1021 (8th Cir. 2001).

To state a violation of § 666(a)(1)(A), the government must allege four elements: (1) the defendant was an agent of an organization, agency, or governmental unit; (2) during the period charged, the defendant embezzled, stole, fraudulently obtained, knowingly converted without authority, or intentionally misapplied property valuing $5,000 or more; (3) the property was owned by, or under the care, custody, or control of the organization, agency, or governmental unit; and (4) the organization, agency, or governmental unit received benefits in excess of $10,000 in the one-year period charged, pursuant to a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of federal assistance.  18 U.S.C. § 666(a)(1)(A) and (b); United States v. Vitillo, No. CR. 03-555, 2004 WL 2496877, at *4 (E.D. Pa. Nov. 2, 2004); cf. Eighth Circuit Model Jury Instruction (Criminal) § 6.18.666A (2011).

Defendant argues that § 666 does not apply to him, because a plain reading of subsection (c) prohibits prosecution under § 666(a) based on his receiving a salary for work performed.  The government argues that defendant was a person who submitted false weekly time sheets and who received weekly salary money based upon the false time sheets falsely certifying the hours he worked.  According to the government, an employee who receives salary money for time in which he did not work or perform services is a "ghost" employee who is not receiving bona fide salary or wages, and that such an employment arrangement is not in the usual course of business of the Treasurer's Office.

Defendant argues that United States v. Harloff[5] applies.   In Harloff, the district court applied § 666(c) and held that it "prevent[s]

_____

[5]815 F. Supp. 618 (W.D.N.Y. 1993).

- 6 -

14

making a federal crime out of an employee's working fewer hours than he or she is supposed to work . . . ."  815 F. Supp. at 619.  Other courts have disputed the correctness of Harloff or questioned its applicability. E.g., United States v. Baldridge, 559 F.3d 1126, 1139 (10th Cir.), cert. denied, 129 S. Ct. 2170 (2009) (holding that § 666(c) does not apply where the defendant did work for which he could not have been paid by his county employer); Vitillo, 2004 WL 2496877, at *8 (holding that the over-reporting of hours actually worked and submitting inaccurate invoices and billing records are not acceptable business practices under § 666(c)); United States v. Abney, No. CRIM. 3-97-CR-260-R, 1998 WL 246636, at *2 (N.D. Tex. Jan. 5, 1998) (holding that fraudulently altering time sheets for payment was not "bona fide" or "in the ordinary course of business" under § 666(c)).

In this case the indictment alleges the essential elements of the offenses charged in Counts IV-VIII.  Regarding § 666(c), the indictment alleges in each one of these counts that defendant Robinson obtained approximately $35,360 by fraud and otherwise submitting false weekly time sheets falsely certifying hours worked.  This indictment is not like the language of the indictment in United States v. Mills,[6] which did not allege that the defendant-employees "did not responsibly fulfill the duties associated with their employment." 140 F.3d at 633.

Ultimately, in assessing the allegations of the instant indictment, the undersigned agrees with the Fifth Circuit Court of Appeals: "Whether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide." United States v. Williams, 507 F.3d 905, 909 (5th Cir. 2007), cert. denied, 553 U.S. 1013 (2008).

Therefore, the motion to dismiss (Doc. 25) should be denied.

**C.  Subject Matter Jurisdiction**

In Counts IV-VIII, defendant is charged with violating 18 U.S.C. § 666(a)(1)(A), which criminalizes theft or bribery concerning programs receiving federal funds.  (Doc. 57 at 9-12.)  Defendant argues that the court lacks subject matter jurisdiction over these counts because his

_____

[6]140 F.3d 630 (6th Cir. 1998).

- 7 -

15

employer, the St. Louis City Treasurer's Office, did not receive in excess of $10,000 in federal funds during each of the respective calendar years, as required by 18 U.S.C. § 666(a)(1)(b).[7]

As set forth above, to establish a violation of § 666(a)(1)(A), the government must show that the organization, agency, or governmental unit received benefits in excess of $10,000 in the one-year period charged, pursuant to a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of federal assistance. 18 U.S.C. § 666(a)(1)(A) and (b); Vitillo, 2004 WL 2496877, at *4; cf. Eighth Circuit Model Jury Instruction (Criminal) § 6.18.666A (2011).

> Counts IV-VIII of the superseding indictment allege that defendant, being an agent of an organization, that is, the City of St. Louis as an employee of the Treasurer's Office, said organization having received during [each respective one-year period] federal funds in excess of $10,000 through grants from the United States Department of Housing and Urban Development, embezzled, stole, obtained by fraud, and intentionally misapplied property and funds worth at least $5,000 owned by, and under the care, custody, and control of the City of St. Louis, that is[,] defendant submitted false weekly time sheets falsely certifying hours worked and defendant was paid by the City of St. Louis based upon those false weekly time sheets and falsely certified work hours approximately $35,360.

(Doc. 57 at 9-12.)

Defendant's argument concerns the indictment's factual allegation that he was an employee of the City of St. Louis by virtue of his employment with the City Treasurer's Office. This argument, however, is more properly construed as a challenge to the sufficiency of the government's evidence; the court has subject matter jurisdiction over Counts IV-VIII on the basis of defendant being "charged with an 'offense against the laws of the United States.' " United States v. Sabri, 326

---

[7]Defendant previously moved to dismiss Counts IV-VIII of the original indictment, arguing that the court lacked subject matter jurisdiction because the "federal program" alleged in the original indictment was a contractual agreement between the Treasurer's Office and the United States Courts. (Doc. 52.) Because the superseding indictment does not include this factual allegation and instead alleges that the "federal program" at issue is the City of St. Louis's receipt of grants from the United States Department of Housing and Urban Development (Doc. 57 at 9-12), this motion to dismiss (Doc. 52) is moot.

Appellate Case: 13-3253   Page: 18   Date Filed: 02/12/2014 Entry ID: 4123547

F.3d 937, 939 n.3 (8th Cir. 2003) (quoting 18 U.S.C. § 3231), aff'd, 541
U.S. 600 (2004); see United States v. Jackson, 313 F.3d 231, 233 (5th
Cir. 2002) (explaining, in rejecting a jurisdictional challenge to
whether a city department received $10,000 in federal funds, that "[t]he
indictment sufficiently invoked the district court's jurisdiction,
alleging violations of 18 U.S.C. § 666, including the allegation that the
[city] received federal funds in excess of $10,000 for each calendar year
at issue" and that "[t]he district court had jurisdiction over the case
because a violation of federal law was charged . . . regardless of the
sufficiency of the Government's proof"); cf. Redzic v. United States, No.
1:11 CV 133 ERW, 2012 WL 447276, at *4 (E.D. Mo. Feb. 13, 2012)
(clarifying that the requirement in § 666(a)(2) that "the object of a
bribe involve anything of value of $5,000 or more" is an element of the
offense, not a requirement for the court's subject matter jurisdiction).

As a challenge to the sufficiency of the government's evidence,
defendant's motion is not properly raised at this time. "[S]o long as
the indictment [is] facially sufficient . . . , federal criminal
procedure does not 'provide for a pre-trial determination of sufficiency
of the evidence.' " United States v. Ferro, 252 F.3d 964, 968 (8th Cir.
2001) (quoting United States v. Critzer, 951 F.2d 306, 307-08 (11th Cir.
1992)). An indictment is facially sufficient if it contains "all of the
essential elements of the offense charged, fairly informs the defendant
of the charges against which he must defend, and alleges sufficient
information to allow a defendant to plead a conviction or acquittal as
a bar to a subsequent prosecution." United States v. Sohn, 567 F.3d 392,
394 (8th Cir. 2009) (citations omitted); see Fed. R. Crim. P. 7(c)(1)
(stating that the indictment "must be a plain, concise, and definite
written statement of the essential facts constituting the offense
charged").

In this case, defendant Robinson is charged in Counts IV-VIII with
violating 18 U.S.C. §§ 666(a)(1)(A) and 2. As to each of these counts,
the indictment alleges all of the four essential elements of a violation
of § 666(a)(1)(A), namely, (1) defendant was an agent of the City of St.
Louis by virtue of his employment with the City Treasurer's Office;
(2) during each of the one-year periods, defendant embezzled, stole,

- 9 -

17

obtained by fraud, and intentionally misapplied funds worth at least $5,000; (3) these funds were owned by and under the care, custody, and control of the City; and (4) the City received more than $10,000 in federal funds during the each of the one-year periods through grants with the United States Department of Housing and Urban Development. (Doc. 57 at 9-12.) The indictment specifically describes defendant's employment with the Treasurer's Office and specifically alleges the years in which defendant falsely certified work hours in his weekly time sheets. Thus, the indictment is legally sufficient on its face.

Moreover, defendant relies on evidence outside of the indictment in arguing that the Treasurer's Office is an independent office statutorily removed from the control of the Mayor of the City of St. Louis, and that he has no ability to control City funds or to bind the City. At this stage of the proceedings, however, the factual allegations in the indictment must be accepted as true. United States v. Sampson, 371 U.S. 75, 78-79 (1962). The court should not look outside the indictment to resolve factual disputes in a pretrial motion. E.g., United States v. Lafferty, 608 F. Supp. 2d 1131, 1137 (D.S.D. 2009). Defendant's argument "would be more appropriately presented as a defense at trial or in a motion for acquittal after the Government has finished its case." United States v. Siers, No. CR 11-30131-RAL, 2011 WL 6826805, at *2 (D.S.D. Dec. 28, 2011) (citing Ferro, 252 F.3d at 968 ("We simply cannot approve dismissal of an indictment on the basis of predictions as to what the trial evidence will be." (quotation omitted))).

Therefore, the motion to dismiss (Doc. 66) should be denied.

## II.  MOTIONS TO SEVER

Defendant Robinson moves to sever Counts I-III of the indictment for a trial separate from Counts IV-VIII.[8]  (Docs. 26, 78.)

---

[8]In his motion, defendant incorporates his previously-filed motion to sever (Doc. 26) and his arguments made in his objections to the first Report and Recommendation (Doc. 46). In its response (Doc. 82), the government adopts its previous-filed responses to defendant's motion to sever (Doc. 29) and to defendant's objections (Doc. 53).

- 10 -

Appellate Case: 13-3253   Page: 20   Date Filed: 02/12/2014 Entry ID: 4123547

The court determines first whether joinder of the counts in one indictment was proper under Federal Rule of Criminal Procedure 8(a).[9] United States v. Garrett, 648 F.3d 618, 625 (8th Cir. 2011); United States v. Midkiff, 614 F.3d 431, 439-40 (8th Cir. 2010).  Rule 8(a) allows for joinder when the offenses are of the same or similar character, are based on the same act or transaction, or constitute parts of a common scheme or plan.  Garrett, 648 F.3d at 625.  Rule 8(a) should be liberally construed to allow joinder if such advances the efficient administration of justice.  United States v. Little Dog, 398 F.3d 1032, 1037 (8th Cir. 2005).  If joinder is proper under Rule 8(a), the defendant may still seek severance under Rule 14[10] upon a sufficient showing of prejudice.  Fed. R. Crim. P. 14(a).

Before trial, the court should determine whether joinder is proper by looking only to the allegations on the face of the indictment.  United States v. Bledsoe, 674 F.2d 647, 655 (8th Cir.), cert denied, 459 U.S. 1040 (1982).  Otherwise, consideration of the expected trial evidence is speculative at best.  There may be a substantial expectation as to what the trial evidence will be; but that expectation is mere speculation until the evidence is received by the court at trial.

---

[9]Federal Rule of Criminal Procedure 8(a) states:

(a) Joinder of Offenses.  The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged--whether felonies or misdemeanors or both--are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed. R. Crim. P. 8(a).

[10]Federal Rule of Criminal Procedure 14(a) states:

(a) Relief.  If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a).

Appellate Case: 13-3253   Page: 21   Date Filed: 02/12/2014 Entry ID: 4123547

The government argues that four federal courts of appeals' opinions support its position that the court can consider the proffered nature of the expected trial evidence when deciding whether joinder is proper under Rule 8.  See (Doc. 33.)  These cases do not persuade.

The most recent Eighth Circuit case relied on by the government is United States v. Wadena.[11]  The relevant portions of Wadena stand for the proposition that when the district court considers whether joinder was proper, it should look to the face of the indictment.  152 F.3d at 848 (citing Bledsoe, 674 F.2d at 655).  In Wadena, the district judge referred the issue of joinder to the magistrate judge, who concluded from the face of the indictment that joinder was improper regarding defendant Clark.  152 F.3d at 847.  On review, the district judge disagreed, concluding that "the [i]ndictment alleged three conspiracies that were a part of a series of acts or transactions, and joinder was proper."  Id. On appeal, the Eighth Circuit ruled that joinder was proper, stating:

> On its face, the [i]ndictment alleges more than a mere overlap in personnel and the common objective of making money.  We deem it clear that the [i]ndictment alleges Clark participated in a series of acts or transactions with the sole purpose of furthering a common scheme of using his and others' positions in tribal government to access tribal funds and misapply those funds for his personal gain.

Id. at 848.  Regarding defendant Wadena's misjoinder argument, the Eighth Circuit ruled that, even if there was misjoinder, Wadena was not entitled to relief on appeal because based on the record, misjoinder did not have a "substantial and injurious effect or influence on the jury's verdict." Id. at 849.  Thus, Wadena expressly stands for the proposition that during the pretrial stage of the case, the district court should assess the propriety of joinder by considering only the face of the indictment.

The statement of Circuit Judge John R. Gibson, joined by five of the eight judges of the Eighth Circuit in United States v. Grey Bear,[12] also invoked by the government, provides the government no safe harbor. There, the ruling of the court was a five-to-five affirmation of the

---

[11]152 F.3d 831 (8th Cir. 1998).

[12]863 F.2d 572 (8th Cir. 1988) (en banc).

- 12 -

20

Appellate Case: 13-3253   Page: 22   Date Filed: 02/12/2014 Entry ID: 4123547

district court's decision on misjoinder and, as such, provides no precedential value. 863 F.2d at 573. Nevertheless, Chief Judge Lay and Judge Gibson expressed differing opinions on whether the face of the indictment dictates the propriety of joinder. Suffice it to say that Chief Judge Lay's reference to the continuing viability of <u>Bledsoe</u> sustains the considerations of the undersigned, expressed above, as to why the court should look only to the face of the indictment to consider the joinder or misjoinder issue during the pretrial stage of the case. Even though Judge Gibson takes issue with the continuing viability of <u>Bledsoe</u>, it should be noted that he first considered the face of the indictment and ruled that it was sufficient to establish that joinder was proper in that case. <u>Id.</u> at 582-83.

The government also cites to <u>United States v. Halliman</u>, 923 F.2d 873, 883 (D.C. Cir. 1991) (holding that the government may sustain the propriety of joinder by a pretrial proffering of evidence), and <u>United States v. Dominguez</u>, 226 F.3d 1235, 1241 (11th Cir. 2000) (holding that the justification for joinder may be shown by a pretrial proffer of evidence or by consideration of the actual trial evidence). The undersigned believes these opinions are unpersuasive because <u>Bledsoe</u> remains the applicable law for the Eighth Circuit. <u>See, e.g.</u>, <u>United States v. Patzer</u>, No. CR 07-30100-KES, 2008 WL 4533638, at *3 (D.S.D. Oct. 2, 2008) (relying on <u>Bledsoe</u> and noting that "[t]he most recent statement on the issue in the Eighth Circuit holds that an indictment must reveal on its face a proper basis for joinder" (internal quotation omitted)); <u>United States v. Sandstrom</u>, No. 05-00344-02-CR-W-ODS, 2006 WL 1128802, at *2 (W.D. Mo. Apr. 27, 2006) ("In the Eighth Circuit, the current rule of law is that whether joinder is proper must be determined from the face of the indictment." (citation omitted)).

Regardless, after looking to the face of the indictment, the undersigned finds that joinder was proper under Rule 8(a).

The Eighth Circuit has found counts of a "same or similar character" when they "refer to the same type of offenses occurring over a relatively short period of time." <u>Garrett</u>, 648 F.3d at 625 (quoting <u>United States v. Robaina</u>, 39 F.3d 858, 861 (8th Cir. 1994) (internal quotation marks omitted)). Count I alleges that defendant knowingly caused a fraudulent

- 13 -

wire communication to be transmitted between PA and Advantage Partners concerning a bill for development work performed on TLPA's building at 4028 Florissant Avenue.   Counts II and III can be characterized as engaging in fraudulent activity against PA during the periods of 2009 to 2010 and 2010 to 2011.   Counts IV through VIII allege, in effect, that defendant engaged in fraudulent activity against the St. Louis City Treasurer's Office in 2006, 2007, 2008, 2009, and 2010.   In a very general way, all of the counts in the indictment are of a similar character (obtaining money by fraudulent activity) and the allegations in the indictment temporally overlap.   Applying Rule 8(a) liberally, joinder of all counts in one indictment was proper.

Misjoinder is but one factor to assess in determining whether severance should be ordered. See Fed. R. Crim. P. 14(a); Zafiro v. United States, 506 U.S. 534, 539 (1993); United States v. Boyd, 180 F.3d 967, 982-83 (8th Cir. 1999).   Joint trials are favored because they "conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial." United States v. Lane, 474 U.S. 438, 449 (1986) (quoting Bruton v. United States, 391 U.S. 123, 134 (1968)).   The court must look to the defendant's showing that prejudice would result from joinder and consider whether such prejudice can be avoided at trial. See United States v. Pherigo, 327 F.3d 690, 693 (8th Cir. 2003) ("To grant a motion for severance, the necessary prejudice must be 'severe or compelling.' " (quoting United States v. Warfield, 97 F.3d 1014, 1018 (8th Cir. 1996))). Relevant factors, such as the effect of limiting instructions, the strength of the government's evidence, and the receipt of evidence not relevant to all counts, often cannot be fully evaluated until trial. United States v. Ghant, 339 F.3d 660, 665-66 (8th Cir. 2003); United States v. Southwest Bus Sales, Inc., 20 F.3d 1449, 1454 n.11 (8th Cir. 1994).

Defendant Robinson argues that evidence of fraud against PA, relevant to Counts I-III, would not be admissible on the remaining counts of fraud against the City.   Defendant argues that even a limiting instruction by the court will be ineffective in preventing the jury from

Appellate Case: 13-3253   Page: 24   Date Filed: 02/12/2014 Entry ID: 4123547

considering irrelevant evidence on the respective counts, and that this prejudice outweighs the value of any efficiency from a joint trial.

While defendant's prejudice argument is strong, the undersigned cannot say at this time whether the factors that will appear at trial (limiting instructions and admonitions to the jury, the amount of evidence that needs to be compartmentalized, and the strength of the government's evidence) will or will not be such to reasonably expect the jury to compartmentalize the evidence.

For these reasons, the motions to sever Counts I-III from Counts IV-VIII (Docs. 26, 78) should be denied without prejudice, to be reasserted at trial upon a sufficient showing of prejudice under Rule 14.

### III.   MOTION FOR CHANGE OF VENUE

Defendant Robinson moves for change of venue, arguing that news stories have created a prejudice against him in the St. Louis metropolitan area such that he will be unlikely to receive a fair trial in this district. (Doc. 68.)

Under Federal Rule of Criminal Procedure 21(a),[13] the court must, upon motion by the defendant, transfer an action to another district if there is so great a prejudice against the defendant within the transferring district that the defendant cannot obtain a fair and impartial trial there. Fed. R. Crim. P. 21(a); see United States v. Green, 983 F.2d 100, 102 (8th Cir. 1992) ("It is a fundamental tenet of due process is that a defendant is entitled to have his guilt determined by a fair and impartial jury.").

The Eighth Circuit has identified a two-tiered analysis as to whether transfer is required by Rule 21(a).  United States v. Nelson, 347

---

[13]Federal Rule of Criminal Procedure 21(a) states:

(a) For Prejudice.  Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

Fed. R. Crim. P. 21(a).

Appellate Case: 13-3253    Page: 25    Date Filed: 02/12/2014 Entry ID: 4123547

F.3d 701, 707-08 (8th Cir. 2003).  First, the court must determine "whether the pretrial publicity [is] so extensive and corrupting that [the court] must presume unfairness of constitutional magnitude exist[s]." Id. at 707 (internal quotations omitted).  This presumption "is reserved for rare and extreme cases," and the defendant "must satisfy a high threshold of proof in order to prove inherent prejudice." Id. at 707-08 (quotations omitted).  Second, if the presumption of unfairness is inapplicable, the court must "look at the voir dire testimony of those who [become] trial jurors to determine if they demonstrate[] . . . actual prejudice . . . ." Id. at 708.

In this case, the pretrial publicity has not been so extensive and corrupting as to warrant the presumption of prejudice.  While several news articles have reported on the prosecution of defendant Robinson, the media coverage has not been "extensive." See United States v. Gamboa, 439 F.3d 796, 815 (8th Cir. 2006) (holding that "[s]everal television news reports and newspaper articles mentioned the upcoming trial and [the defendant]'s involvement" was not "extensive" coverage).  The news articles submitted by defendant for court review were objective and generally not emotionally opinionated. United States v. Allee, 299 F.3d 996, 1000 (8th Cir. 2002).  This is not one of the "rare and extreme" cases in which inherent prejudice from pretrial publicity should be presumed. Nelson, 347 F.3d at 707.

Regarding the second tier of the prejudice analysis, which examines voir dire testimony to determine whether actual prejudice exists, this inquiry is premature, as voir dire has not yet occurred.  When this case reaches voir dire, the court should consider defendant's concerns regarding actual prejudice due to pretrial publicity. E.g., Green, 983 F.2d at 102 ("[I]t is preferable for the trial court to await voir dire before ruling on motions for a change of venue."); United States v. Garrett, No. 4:08 CR 703 ERW, 2009 WL 1688181, at *6 (E.D. Mo. June 17, 2009) (waiting until voir dire to consider actual prejudice argument).

Therefore, the motion for change of venue (Doc. 68) should be denied without prejudice, to be renewed upon a sufficient showing of actual prejudice following voir dire.

Appellate Case: 13-3253   Page: 26   Date Filed: 02/12/2014 Entry ID: 4123547

### IV.   MOTIONS TO SUPPRESS

Defendant Robinson has moved to suppress the evidence the government acquired through the attachment of a Global Position Satellite (GPS) tracker device to his motor vehicle without judicial authorization. (Docs. 27, 67.)

From the evidence adduced during the hearings, the undersigned makes the following findings of fact and conclusions of law:

### FACTS
#### Initial Investigation

1.   On October 29, 2009, Federal Bureau of Investigation (FBI) Special Agent Monique Comeau[14] interviewed a former St. Louis City Treasurer's Office (Treasurer's Office) employee, Curtis Royceton. Royceton had worked for the Treasurer's Office for 13 years as a Human Resources Personnel Analyst, which gave him knowledge of the Treasurer's Office's employee payroll information and work hours.  His employment with the Treasurer's Office was terminated when his department, the Parking Meter Maintenance Department, was privatized in 2009.

2.   Royston told Agent Comeau that, while working for the Treasurer's Office, Royceton learned that a "ghost" employee with the last name of "Robinson" was on the Treasurer's Office's payroll. According to Royceton, this employee collected a paycheck from the Treasurer's Office for performing work despite not actually performing any work for the Treasurer's Office.[15]  This employee was also a friend of the St. Louis City Treasurer, Larry Williams, and was involved in a charter school venture known as the Paideia Academy (PA) with Williams.

3.   Royceton also told Agent Comeau that every few weeks, for several hours at a time, Williams took him to an office located on

_____

[14]Agent Comeau has been a Special Agent with the FBI for approximately 17 years.

[15]To Agent Comeau, a "ghost" employee was one who collects a paycheck for work performed despite not actually performing the work.

- 17 -

25

Lindell Avenue (Lindell Office)[16] to perform computer work for PA.[17]  This occurred during regular business hours, while Royceton was supposed to be performing work for the Treasurer's Office.   During these times, Williams remained with Royceton at the Lindell Office while Royceton performed the computer work for PA.

     4.   Royceton also told Agent Comeau that other Treasurer's Office employees knew of the "ghost" employee but did not discuss the matter. Royceton believed that the "ghost" employee named "Robinson" had been on the Treasurer's Office's payroll for years, although Royceton did not know at what salary.

     5.   After meeting with Royceton, Agent Comeau verified, through employment records with the State of Missouri, that defendant Fred W. Robinson was an employee of the City of St. Louis.  Agent Comeau also visited PA's website, which listed defendant Robinson as the Chairman of the PA Board of Trustees and Williams as a member of the PA Board of Trustees.

     6.   In late November or early December 2009, Agent Comeau contacted Assistant United States Attorney (AUSA) Hal Goldsmith, who informed her that certain individuals had contacted the United States Attorney's Office regarding the St. Louis City Treasurer's Office.  AUSA Goldsmith provided Agent Comeau with the names of Ben Philips, Dan Parsons, and Harold Miner, two of whom AUSA Goldsmith had already interviewed.[18]

     7.   On Tuesday, December 8, 2009, Agent Comeau conducted surveillance of defendant Robinson's residence, located at 8726 Partridge Avenue.  Agent Comeau sought to determine whether defendant was receiving a paycheck from the Treasurer's Office despite not actually performing any work for the Treasurer's Office.  At 6:50 a.m., Agent Comeau observed

---

     [16]Royceton told Agent Comeau that the Lindell Office was located in the same building that housed the St. Louis American newspaper, which Agent Comeau believed was at 4242 Lindell Avenue.

     [17]Royceton has a background in computers.

     [18]The record is unclear as to which two individuals AUSA Goldsmith had already interviewed.

a red Saturn automobile pull onto Partridge Avenue and park. A woman left the vehicle and went into the residence at 8726 Partridge Avenue. A record check of the Saturn's license plate revealed that the vehicle was registered to Audrey Robinson.

8.   At 9:00 a.m., Agent Comeau saw defendant Robinson leave his residence and enter a blue Chevrolet Cavalier automobile, license plate number "SE1J8M." A record check of this plate indicated that this vehicle was registered to defendant. Defendant drove to the Goody Goody Diner, parked, and entered the diner. At 10:06 a.m., he left the diner and went to PA. He parked on 20th Street, got out of the Cavalier, and entered the PA administration building. He remained in the building up to 11:10 a.m., when Agent Comeau left.

9.   On Wednesday, December 9, 2009, at 11:00 a.m., Agent Comeau performed "spot surveillance," during which she observed defendant's Cavalier parked on 20th Street in front of the PA administrative building, in the same location as the day before. After fifteen or twenty minutes, Agent Comeau left. At 2:45 p.m., Agent Comeau returned to the PA administration building, where she observed defendant's Cavalier still parked. Agent Comeau left fifteen minutes later, with defendant's Cavalier still parked on 20th Street in front of the PA administrative building.

10.   On Thursday, December 10, 2009, Agent Comeau spoke again with Royceton. Royceton told Agent Comeau that payroll records indicated that defendant worked both day and night shifts, which made Royceton suspicious because he was not aware of any Treasurer's Office employees working at night. Royceton never saw defendant perform any work at the Treasurer's Office, and saw him only when he came in to pick up his paycheck. Royceton learned defendant's name when Williams introduced defendant to him while he was performing computer work for PA at the Lindell Office. Defendant was usually present when Royceton performed computer work for PA at the Lindell Office. During these times, which were during regular business hours, defendant was working on PA-related matters.

11.   On December 14, 2009, Agent Comeau interviewed another former Treasurer's Office employee, Dan Parsons. Parsons had been an auditor

- 19 -

Appellate Case: 13-3253   Page: 29   Date Filed: 02/12/2014 Entry ID: 4123547

for the Treasurer's Office for 21 years.  After the privatization of the Parking Department in 2009, Parsons retired with a disability.

12.   Parsons told Agent Comeau that he was "very familiar" with the Treasurer's Office's employees, including the employees of the Parking Enforcement Division.   According to Parsons, the State of Missouri audited the Treasurer's Office in the early 1990s and questioned the Treasurer's Office's payroll, which made him suspicious of "ghost" employees being on the Treasurer's Office's payroll.[19]  In light of the state audit, a new procedure was introduced requiring employees to sign for their paychecks.  Agent Comeau showed Parsons a copy of defendant's driver's license photograph, but Parsons could not identify defendant. When asked, Parsons stated that he was not familiar with the name "Fred Robinson."

13.   Parsons also told Agent Comeau that the Treasurer's Office was not a department of the City of St. Louis, and that revenue from parking meters, parking garages, and parking enforcement paid the salaries of the City Treasurer and the Treasurer's Office employees.

14.   On December 17, 2009, Agent Comeau interviewed another former Treasurer's Office employee, Ben Philips.  Philips had been an employee of the City of St. Louis for 28 years, during 10 of which he worked for the Treasurer's Office.  As the former Deputy Director of Administration, Philips was familiar with the Treasurer's Office's payroll, Williams, and defendant.  Philips knew that Williams and defendant were involved with PA and that defendant was part of an "external security squad" over parking meters and was supposed to work at night.  Philips had not known defendant to work and was surprised that Williams approved overtime for defendant.   Philips suspected that defendant "kicked back" money to Williams because defendant was being paid for work he was not performing.

---

[19]Parsons told Agent Comeau that he noticed that several individuals picked up paychecks, although he was unaware of any work these individuals performed.

- 20 -

28

15.    Philips also told Agent Comeau that Roy White, the supervisor of the Treasurer Office's "external security" division, had worked for the Treasurer's Office for 20 years and supervised defendant.[20]

16.    Philips also told Agent Comeau that he believed that two other named Treasurer's Office employees "did not perform a lot of work." Philips said that he stated his concerns to Assistant Treasurer Jackie Adams, but not to Williams.

17.    On January 7, 2010, Agent Comeau interviewed another former Treasurer's Office employee, Harold Miner.  Miner had been an employee of the Treasurer's Office for 35 years.  He worked his way from administrative roles to becoming the Director of Fleet Operations and Maintenance; then he became the Deputy Director of Operations; and finally he became the Supervisor of the Parking Meter Revenue Collection, Maintenance, and Parking Enforcement department.  He stopped working for the Treasurer's Office in 2009.  Miner said that he was familiar with an "external security" department of the Treasurer's Office and believed that Williams used the department as a way to pay certain individuals a salary without them working and without being detected.  Miner said that Williams protected these individuals by having them turn in their paperwork directly to Williams.  Through his position Miner had access to payroll records and saw other individuals, besides defendant, on the payroll who he believed were "ghost" employees.

18.    Miner told Agent Comeau that he believed that defendant did not perform any work and that he was not aware of any documentary work product that defendant turned in other than his time sheets.  Miner also said that defendant never drove a City vehicle and went to the Treasurer's Office only to pick up his paychecks.

19.    Miner told Agent Comeau that in his position at the Treasurer's Office, Miner learned of any parking meter-related or parking enforcement-related issues that arose on the streets and took part in resolving any such issues.  Miner occasionally saw defendant in

_____

[20]Agent Comeau did not interview Roy White prior to affixing the GPS to defendant's Cavalier on January 22, 2010, because the investigation was covert; Agent Comeau was concerned that news of the investigation would reach the Treasurer's Office, including Williams.

Appellate Case: 13-3253   Page: 31   Date Filed: 02/12/2014 Entry ID: 4123547

Williams's office but never saw defendant working, either during the day or at night.   Miner also said that several years ago, defendant's daughter and defendant's girlfriend worked at the Treasurer's Office. Miner added that another named individual had been a "ghost" employee of the Treasurer's Office's "external security" team for 8 or 9 years, but was now deceased.   Miner did not bring any of his concerns to Williams because he did not want to create problems, but he did voice his concerns to Assistant Treasurer Jackie Adams.

20.   Miner also told Agent Comeau that at least two other Treasurer's Office employees, whose last names he provided to Agent Comeau, "performed little or no work."   Miner named another individual who was hired by the Treasurer's Office as an engineer, even though the Treasurer's Office did not need a full-time engineer, and that the named Assistant Treasurer "did not do a lot of work."[21]

21.   Miner also told Agent Comeau that Williams and the Assistant Treasurer had a real estate business with an office located at 4200 Lindell Avenue, in the City of St. Louis.   Agent Comeau believed that this was the same office as the Lindell Office described by Royceton, though she did not verify this.

22.   From her interviews with Royceton, Parsons, Philip, and Miner, Agent Comeau believed that the Treasurer's Office "external security" division members' primary job duty was to check whether citizens or City employees were breaking into parking meters.[22]

23.   Prior to interviewing Parsons, Philip, and Miner, Agent Comeau learned that these individuals had filed a lawsuit against the Treasurer's Office arising out of their terminations from the Treasurer's Office.   During her investigation, Agent Comeau did not ask Parsons, Philip, or Miner about the details of their lawsuit.

---

[21]Agent Comeau did not investigate these individuals for possible criminal conduct, because although they may have been unproductive, they were physically present at work.

[22]Because she did not want Williams to know of her investigation, Agent Comeau did not ask Williams about the job duties of the "external security" division.

Appellate Case: 13-3253     Page: 32     Date Filed: 02/12/2014 Entry ID: 4123547

24.   Throughout the investigation, Agent Comeau maintained frequent contact with AUSA Goldsmith.  On January 14, 2010, Agent Comeau met with AUSA Goldsmith to discuss the possibility of attaching a GPS tracker device to defendant's Cavalier.  Agent Comeau believed that a GPS tracker device would aid the investigation into how defendant was spending his time.[23]  From her discussions with AUSA Goldsmith, Agent Comeau did not believe that a warrant was necessary prior to affixing a GPS tracker device to defendant's Cavalier.  The decision to affix the GPS tracker device, without judicial authorization, was collectively made by Agent Comeau, AUSA Goldsmith, FBI Special Agent Tim Feeney, FBI Chief Division Counsel Craig Sieverson, and the then-Assistant FBI Special Agent in Charge.

<u>Additional Surveillance</u>

25.   During the week of Monday, January 11, to Friday, January 15, 2010, Agent Comeau went to PA two or three times to confirm that defendant was still driving the Cavalier, not the Saturn, and to corroborate that defendant was doing PA work instead of Treasurer's Office work.  During these times, Agent Comeau observed defendant's Cavalier parked in front of the PA administration building on 20th Street.

26.   Agent Comeau also went to defendant's residence on Partridge Avenue.  The residence did not have a driveway, but there was a detached garage located behind the house.  Agent Comeau drove through the alleyway behind the residence to examine the detached garage in order to determine whether defendant ever parked his Cavalier in the detached garage.  Agent Comeau saw that leaves and branches were growing against the garage door, from which she deduced that a car had not been parked in the garage recently.

27.   From midnight to 4:00 a.m. on Tuesday, January 19, Wednesday, January 20, and Thursday, January 21, 2010, Agent Comeau, FBI Special

---

[23]Agent Comeau believed that five or six agents would be necessary for an entire day of physical surveillance of defendant.

Appellate Case: 13-3253     Page: 33     Date Filed: 02/12/2014 Entry ID: 4123547

Agent Christina Kenny,[24] and FBI Special Agent Hannah Meyer conducted surveillance of defendant's residence. Each night, Agent Comeau observed defendant's Cavalier parked on the street. Agent Comeau did not observe defendant leave his residence during any of these times, nor did she see defendant with Williams.

### Suspicion of Criminal Activity

28.   Based on the information gathered during the investigation, Agent Comeau suspected that defendant Robinson was a "ghost" employee of the Treasurer's Office, because he spent his time performing PA work instead of Treasurer's Office work despite being on the Treasurer's Office's payroll. On this basis, Agent Comeau believed that defendant may have violated and was violating 18 U.S.C. § 666 by defrauding the City of St. Louis.

29.   Agent Comeau found no evidence that defendant was giving "kickbacks" or money to Williams. Agent Comeau did not look at defendant's Treasurer's Office time sheets prior to attaching the GPS tracker device to defendant's Cavalier. Agent Comeau was unaware of whether defendant was on vacation or taking sick days during the surveillance, and did not know the exact hours that defendant was supposed to be performing work for the Treasurer's Office.

30.   Agent Comeau believed that her investigation corroborated the allegations against defendant. Although Royceton, Parsons, and Philips worked during the day and Miner worked evenings and weekends as-needed, Agent Comeau believed their allegations were credible based on her observations during her surveillance, because defendant was not turning in work product, and because defendant did not drive a City-owned vehicle.

31.   Agent Comeau did not believe that defendant was going to flee or that defendant posed a physical danger to others.

_____

[24]On one of these nights, Agent Kenny arrived at 1:00 a.m. instead of midnight.

Appellate Case: 13-3253   Page: 34   Date Filed: 02/12/2014 Entry ID: 4123547

GPS Tracker Device

32.   During the early morning hours of January 22, 2010, to facilitate the physical surveillance of defendant's movements during the day, without first obtaining a court order the agents surreptitiously affixed a GPS tracker device to the exterior of defendant's Cavalier. The device was rectangular in shape, three-to-four inches wide, seven-to-eight inches long, and two-to-three inches thick.  It was powered by its own battery; no external power from the Cavalier was necessary to operate it.   The device used a built-in antenna[25] to receive and to transmit electronic data.   A magnetic component of the device allowed it to be affixed to a metal portion of the Cavalier without the use of screws or another mechanical device that would have required drilling into the body of the vehicle.  The purpose of the tracker was to observe and record the movements and locations, in realtime, of defendant's Cavalier.

33.   The GPS tracker device was affixed to the undercarriage of the Cavalier when the vehicle was parked on the public street near defendant's residence.

34.   The GPS tracker device generally received and transmitted data 24 hours of each day from January 22 to March 17, 2010, when it ceased operating.  But, without the agents intending this, on several occasions during this period of time, the device ceased operating on its own accord and then returned to operating on its own, without the efforts of the investigating agents.

35.   During the time the GPS tracker device was affixed to the Cavalier, the investigators also conducted physical personal surveillance of the Cavalier.   At no time did the investigating agents have information from any source that the Cavalier had been driven into any garage, including the detached garage located behind defendant's residence, or onto any driveway. At no time while it was affixed to the Cavalier was the GPS tracker device serviced by a technician.

---

[25]To operate properly, the antenna had to "see the sky."  It would not operate properly if it was inside a roofed enclosure.  The antenna could not receive or record conversations within the interior of the Cavalier.  The GPS device could not identify the driver of the Cavalier and did not affect the operation of the Cavalier in any way.

- 25 -

33

36.   At all times, the Cavalier, with the GPS tracker device attached, was operated on public streets, observable by passers-by.

37.   When parked near the PA administration building, the Cavalier was always parked on the public street in front of the PA administration building.  The Cavalier was seen parked also outside the location on West Florissant Avenue which was being developed as The Little People's Academy (TLPA).   The investigating agents never saw the Cavalier being driven by anyone else, including defendant's wife; she was observed driving a different vehicle.

38.   On March 23, 2010, the GPS tracker device was removed surreptitiously from the Cavalier, while the vehicle was parked on the public street outside defendant's residence.  Nothing invasive was done to the Cavalier to remove the GPS tracker device.

39.   During their investigation, the agents observed, and the GPS tracker device indicated, defendant's daily pattern of activity.

40.   The agents delayed applying for grand jury subpoenas for defendant's City employment time sheets until after the GPS tracker device was removed from the Cavalier.


### DISCUSSION

Defendant Robinson argues that the evidence obtained by the government from the warrantless operation of the GPS tracker device should be suppressed, because the installation and use of the device violated his First and Fourth Amendment rights.[26]

Issues raised in defendant Robinson's motions to suppress were recently addressed by the Supreme Court in United States v. Jones, 132 S. Ct. 945 (2012).  In Jones, the Supreme Court addressed the question

---

[26]The government moved for leave to present additional evidence regarding reasonable suspicion following the Supreme Court's decision in Jones. (Doc. 61.)  Because the Supreme Court's decision in Jones was not issued until after the government's initial briefing, the court allowed the government to present additional evidence and arguments against suppression at this stage of the proceedings.  See, e.g., United States v. Castellanos, 608 F.3d 1010, 1019-20 (8th Cir. 2010) (holding that there was no waiver where the government "raised [an argument] at the earliest practicable time").

Appellate Case: 13-3253    Page: 36    Date Filed: 02/12/2014 Entry ID: 4123547

of whether the installation of a GPS tracking device onto a suspect's vehicle, coupled with the subsequent use of the device to monitor the vehicle's movements, constitutes a "search" under the Fourth Amendment. 132 S. Ct. at 949.  The Court unanimously answered this question in the affirmative.  Id. at 949, 954, 964.

Justice Scalia, writing for Chief Justice Roberts, Justice Kennedy, Justice Thomas, and Justice Sotomayor, stated that "the Katz[27] reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." Id. at 952. According to the majority, the installation and use of the GPS tracking device was a "search," because the government had committed a common-law trespass for the purpose of obtaining information, conduct which "would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." Id. at 949-51 (explaining that at a minimum, the Fourth Amendment protects "that degree of privacy against government that existed when the Fourth Amendment was adopted" (citation omitted)).  The majority declined to address whether the installation and use of a GPS tracking device would have been a Fourth Amendment "search" absent the common-law trespass.  Id. at 953-54.

Justice Sotomayor wrote a concurring opinion agreeing that the "common-law trespassory test" augmented the "reasonable expectation of privacy" test, but also stated that long-term GPS monitoring impinges on expectations of privacy.  Id. at 954-55 (Sotomayor, J., concurring). Justice Sotomayor also discussed the attributes of GPS monitoring and considered whether an individual has a reasonable expectation of privacy in the sum of his or her movements and whether society recognizes this expectation as reasonable.  Id. at 955-57.

Justice Alito, joined by Justice Ginsburg, Justice Breyer, and Justice Kagan, filed a concurring opinion disagreeing with the conclusion that the "common-law trespassory theory" survived Katz but agreeing that a Fourth Amendment "search" had occurred, reasoning that "the use of

---

[27]Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

Appellate Case: 13-3253     Page: 37     Date Filed: 02/12/2014 Entry ID: 4123547

longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy." Id. at 957-64 (Alito, J., concurring).

## A.  Fourth Amendment

The Fourth Amendment to the Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV.  To secure these rights, the Fourth Amendment provides "no Warrants shall issue, but upon probable cause, supported by Oath of affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Id.  The goal of the Fourth Amendment is to ensure that a search will be carefully tailored to its justifications, and will not become a wide-ranging exploratory search. Maryland v. Garrison, 480 U.S. 79, 84 (1987).

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (footnotes omitted).  When the government seeks to introduce evidence seized during a warrantless search, it bears the burden of demonstrating the applicability of an exception to the warrant requirement. United States v. Kennedy, 427 F.3d 1136, 1144 (8th Cir. 2005).

### 1.  Reliance on Binding Precedent

The government first argues that the evidence obtained from the GPS tracker device should not be suppressed because the agents reasonably relied on binding precedent in believing that judicial authorization was not required prior to installing and using the GPS tracker device.

"The ordinary sanction for police violation of Fourth Amendment limitations has long been suppression of the evidentiary fruits of the transgression." United States v. Fiorito, 640 F.3d 338, 345 (8th Cir. 2011).  Suppression of evidence, however, "is not an automatic consequence of a Fourth Amendment violation." Herring v. United States, 555 U.S. 135, 137 (2009).  The judicially-created exclusionary rule is "a deterrent sanction that bars the prosecution from introducing evidence

- 28 -

Appellate Case: 13-3253     Page: 38     Date Filed: 02/12/2014 Entry ID: 4123547

obtained by way of a Fourth Amendment violation." _Davis v. United States_, 131 S. Ct. 2419, 2423 (2011); _accord_ _Stone v. Powell_, 428 U.S. 465, 486 (1976) ("The primary justification for the exclusionary rule . . . is the deterrence of police conduct that violates Fourth Amendment rights."). Thus, "[w]here suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly unwarranted.' " _Davis_, 131 S. Ct. at 2426-27 (quotation omitted).

Appreciable deterrence, while necessary, is not itself sufficient to warrant suppression; the need for exclusion also must outweigh the "substantial societal costs" that derive from "ignor[ing] reliable, trustworthy evidence bearing on guilt or innocence." _Id._ at 2427. The need for suppression is tied to "the culpability of the law enforcement conduct" in that:

> When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But where the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way.

_Id._ at 2427-28 (internal citations and quotations omitted); _see also_ _United States v. Leon_, 468 U.S. 897, 909 (1984) (articulating the "reasonable good-faith belief" exception to the exclusionary rule). Recently, in _Davis v. United States_, the Supreme Court extended this rationale, stating that "when the police conduct a search in objectively reasonable reliance on binding appellate precedent" that is later overruled, "the exclusionary rule does not apply." 131 S. Ct. at 2434.

To determine whether officers objectively and reasonably relied on binding precedent in conducting a search, courts evaluate whether the officers "acted in strict compliance with then-binding Circuit law." _Id._ at 2428; _see also_ _United States v. Amaya_, ___ F. Supp. 2d ___, No. CR 11-4065-MWB, 2012 WL 1188456, at *7 (N.D. Iowa Apr. 10, 2012) ("Lower courts, accordingly, when applying _Davis_, have looked to officers' compliance with, not knowledge of, binding appellate precedent."), _withdrawn in part on other grounds_, ___ F. Supp. 2d ___, No. CR 11-4065-MWB, 2012 WL 1523045 (N.D. Iowa May 1, 2012).

- 29 -

Appellate Case: 13-3253   Page: 39   Date Filed: 02/12/2014 Entry ID: 4123547

The government first identifies two Supreme Court opinions, United States v. Knotts[28] and United States v. Karo,[29] in support of its good-faith argument.  In Jones, the Court stated that Knotts and Karo do not support the proposition that the warrantless, trespassory installation of a GPS tracker device on a suspect's vehicle for the purpose of monitoring the vehicle's movements is not a Fourth Amendment "search." Jones, 132 S. Ct. at 951-52 (reasoning that in both Knotts and Karo, the electronic beepers were installed in containers with the consent of the containers' original owners prior to coming into the suspects' possession).  Both Knotts and Karo remain good law post-Jones; neither was overruled by Jones.  Id.

While neither Knotts nor Karo precisely authorized the warrantless, trespassory installation and use of a GPS tracker device, the agents' belief that their actions were permitted under these holdings was reasonable.  This reasonableness is supported by the then-existing judicial opinions from other circuits and, later, by a ruling of the Eighth Circuit.  See United States v. Leon, ___ F. Supp. 2d ___, No. CR 09-00452 JMS, 2012 WL 1081962, at *4-6 (D. Hawaii Mar. 28, 2012) (holding that based on Knotts, other circuits' holdings, and the Ninth Circuit's subsequent holding, agents acted with an objectively reasonable good-faith belief that they did not need a warrant prior to installing a GPS tracking device on a suspect's vehicle and using the device to monitor the vehicle's movements).

In Knotts, the Court held that the law enforcement officers' use of an electronic beeper, which was hidden inside a chemical container with the original owner's consent prior to coming into the defendant's possession, to track the defendant's movements as he traveled on public roads with the container in his vehicle did not violate the Fourth Amendment:

> A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another.  When [one of the defendant's co-conspirators] travelled over the public streets he voluntarily

---

[28]460 U.S. 276 (1983).

[29]468 U.S. 705 (1984).

Appellate Case: 13-3253   Page: 40   Date Filed: 02/12/2014 Entry ID: 4123547

conveyed to anyone who wanted to look the fact that he was travelling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto public property.

460 U.S. at 281-82. In Karo, the Court held that the consensual installation of an electronic beeper in a can prior to coming into the defendant's possession was not a search because the beeper, while "creat[ing] the potential for an invasion of privacy," actually "conveyed no information that [the defendant] wished to keep private, for it conveyed no information at all." 468 U.S. at 712.

Prior to the agents' installation and use of the GPS tracker device on defendant's Cavalier, those circuits that had occasion to address the issue held, relying on Knotts, that no warrant was needed. See United States v. Pineda-Moreno, 591 F.3d 1212, 1216-17 (9th Cir. 2010)[30] ("[T]he police did not conduct an impermissible search of [the defendant]'s car by monitoring its location with mobile tracking devices."), vacated and remanded, 132 S. Ct. 1533 (2012); United States v. Garcia, 474 F.3d 994, 997 (7th Cir. 2007) ("But GPS tracking is on the same side of the divide with the surveillance cameras and the satellite imaging, and if what they do is not searching in Fourth Amendment terms, neither is GPS tracking."), cert. denied, 552 U.S. 883 (2007). The only contrary federal court of appeals opinion, the District of Columbia Circuit's decision in United States v. Maynard,[31] was not decided until almost five months after the agents removed the GPS tracker device from defendant's vehicle.

"And although not directly relevant to the agents' objectively reasonable good-faith belief" at the time of the installation and use, Leon, 2012 WL 1081962, at *5, four months after the agents installed the GPS tracker device, three judges of the Eighth Circuit Court of Appeals held that "when police have reasonable suspicion that a particular vehicle is [involved in criminal activity], a warrant is not required

_____

[30]Pineda-Moreno was decided on January 11, 2010—prior to the agents' installation of the GPS tracker device on January 22, 2010.

[31]615 F.3d 544 (D.C. Cir. 2010), aff'd sub nom. United States v. Jones, 132 S. Ct. 945 (2012).

when, while the vehicle is parked in a public place, they install a non-invasive GPS tracking device on it for a reasonable period of time." United States v. Marquez, 605 F.3d 604, 610 (8th Cir. 2010). In so holding, the Eighth Circuit relied, in part, on Knotts and Karo. Id. at 609-10. See Leon, 2012 WL 1081962, at *5 ("[A] court would be hard-pressed to place culpability on the agents for their actions in 2009 when, one year later, three judges of the Ninth Circuit relied on Knotts to conclude that the prolonged use of a GPS tracking device did not violate the Fourth Amendment.").

In light of the Supreme Court's opinions in Knotts and Karo, as interpreted and applied by the Ninth Circuit in Pineda-Moreno, the Seventh Circuit in Garcia, and subsequently by the Eighth Circuit in Marquez, the undersigned concludes that the agents acted in objective, reasonable reliance on binding precedent when they installed and used the GPS tracker device. As such, the evidence obtained by using the GPS tracker device should not be suppressed. See Davis, 131 S. Ct. at 2429 (noting that "in 27 years of practice under Leon's good-faith exception, [the Supreme Court has] never applied the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct" (citation omitted)).

In this case, the relevant binding precedent was not factually identical and was ultimately distinguished by the Court in Jones. But the agents' ultimately erroneous interpretation of Supreme Court precedent was no more culpable than if they had relied on factually identical Supreme Court precedent that was later overturned. See id. at 2439 (Breyer, J., dissenting) (noting that an officer is not "more culpable where circuit precedent is simply suggestive rather than 'binding,' where it only describes how to treat roughly analogous instances, or where it just does not exist"). As evidenced by the Seventh, Eighth, and Ninth Circuits' holdings, the agents' interpretation of binding precedent was reasonable; the agents did not exploit an unanswered or disputed question of law. Cf. United States v. Johnson, 457 U.S. 537, 561 (1982) ("Official awareness of the dubious constitutionality of a practice would be counterbalanced by official certainty that, so long as the Fourth Amendment law in the area remained

- 32 -

unsettled, evidence obtained through the questionable practice would be excluded only in the one case definitively resolving the unsettled question."). See also Davis, 131 S. Ct. at 2435 (Sotomayor, J., concurring) (recognizing that although the court of appeals required the "precedent on a given point [to be] unequivocal," the majority in Davis left this issue unresolved).

Therefore, the evidence obtained from the warrantless, trespassory installation and use of the GPS tracker device should not be suppressed, because the officers objectively and reasonably relied on binding precedent in believing that they did not need a warrant prior to installing the GPS tracker device onto defendant's vehicle and using the device to monitor the vehicle's movements.

### 2.  Reasonable Suspicion

The government also argues that although installation and use of the GPS tracker device was a Fourth Amendment "search," it was not an "unreasonable search" for which the Fourth Amendment requires a warrant.

In Jones, the Court did not reach the issue of whether a warrant is required for law enforcement agents to install a GPS tracking device on a suspect's vehicle and to use the device to monitor the vehicle's movements:

> The Government argues in the alternative that even if the attachment and use of the device was a search, it was reasonable—and thus lawful—under the Fourth Amendment because "officers had reasonable suspicion, and indeed probable cause, to believe that [the defendant] was a leader in a large-scale cocaine distribution conspiracy." We have no occasion to consider this argument. The Government did not raise it below, and the D.C. Circuit therefore did not address it. We consider the argument forfeited.

132 S. Ct. at 954 (internal citations omitted).

"[T]he Fourth Amendment bars only unreasonable searches and seizures." Maryland v. Buie, 494 U.S. 325, 331 (1990); accord United States v. Sharpe, 470 U.S. 675, 682 (1985) ("The Fourth Amendment is not, of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures."); Vale v. Louisiana, 399 U.S. 30, 36 (1970) (Black, J., dissenting) ("A warrant has never been

- 33 -

41

Appellate Case: 13-3253   Page: 43   Date Filed: 02/12/2014 Entry ID: 4123547

thought to be an absolute requirement for a constitutionally proper search."). Whether a search is "reasonable" under the totality of the circumstances "is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Samson v. California, 547 U.S. 843, 848 (2006) (citation omitted); see also Bell v. Wolfish, 441 U.S. 520, 559 (1979) (explaining that when examining the reasonableness of a Fourth Amendment search, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted"); Terry v. Ohio, 392 U.S. 1, 21-31 (1968) (similar).

In Marquez, the Eighth Circuit determined that "when police have reasonable suspicion that a particular vehicle is [involved in criminal activity], a warrant is not required when, while the vehicle is parked in a public place, they install a non-invasive GPS tracking device on it for a reasonable period of time." 605 F.3d at 610.

The government argues that because the agents had a reasonable suspicion that defendant Robinson was engaging in criminal conduct, the agents did not need a warrant prior to installing the GPS tracker device on defendant's vehicle and using the device to track the vehicle's movements.[32]

The undersigned concludes that Marquez was not disturbed by the Supreme Court's holding in Jones; as discussed above, the Jones Court declined to address whether such a search would be reasonable without a warrant if the investigating agents reasonably suspected criminal activity. Jones, 132 S. Ct. at 954. As such, Marquez remains binding law in the Eighth Circuit.

Moreover, Marquez's implicit conclusion, that the privacy intrusion of GPS monitoring of a suspect's vehicle is outweighed by the need for GPS monitoring to promote government interests, is supported by Supreme Court precedent. The Court has recognized that "[g]enerally, less

---

[32]The government does not argue that the agents had probable cause to believe that defendant Robinson was engaging in criminal activity prior to installing and using the GPS tracker device.

- 34 -

Appellate Case: 13-3253   Page: 44   Date Filed: 02/12/2014 Entry ID: 4123547

stringent warrant requirements have been applied to vehicles," and that "[t]he search of an automobile is far less intrusive on the rights protected by the Fourth Amendment than the search of one's person or of a building." Cardwell v. Lewis, 417 U.S. 583, 589-90 (1974).  The Court has explained:

> One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects.  A car has little capacity for escaping public scrutiny.  It travels public thoroughfares where its occupants and its contents are in plain view.  What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.

Id. at 591 (citations and quotations omitted).  The privacy intrusion from the installation of a GPS tracking device is, at most, minimal.  See New York v. Class, 475 U.S. 106, 114 (1986) ("The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.' ").  Nor is the use of a GPS tracking device to monitor a vehicle's movements on public roads highly intrusive upon an individual's expectation of privacy.  The device does not reveal the identity of the vehicle's occupants, nor does it reveal their conduct or conversation; the device reveals only the vehicle's location.[33]  See Knotts, 460 U.S. at 281 ("A person travelling in an automobile on public

---

[33]In her concurring opinion in Jones, Justice Sotomayor expressed concern that long-term GPS monitoring reveals "a wealth of detail about [a person's] familiar, political, professional, religious, and sexual associations." 132 S. Ct. at 955 (Sotomayor, J., concurring).  Justice Alito went as far as to say that society's expectation has been that law enforcement officers would not and could not "secretly monitor and catalogue every single movement of an individual's car for a very long period." Id. at 964 (Alito, J., concurring).  The current state of the law, however, is that an individual has "no reasonable expectation of privacy in his movements from one place to another," Knotts, 460 U.S. at 281, and as Justice Scalia noted during oral argument in Jones, "100 times zero equals zero."  Oral Argument at 40:25-41:1, United States v. Jones, 132 S. Ct. 945 (No. 10-1259) (2012) (Scalia, J.); but see Maynard, 615 F.3d at 562 (applying the "mosaic theory" to information gathered during prolonged surveillance).  As Justice Sotomayor noted in her concurring opinion, holding otherwise would require the Court "to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties." Jones, 132 S. Ct. at 957 (Sotomayor, J., concurring).

- 35 -

43

thoroughfares has no reasonable expectation of privacy in his movements from one place to another."); cf. Smith v. Maryland, 442 U.S. 735, 743–45 (1979) (holding that the installation and use of a pen register at the telephone company's central office to record the numbers dialed from the telephone in the defendant's home was not a "search").

Requiring the presence of particularized reasonable suspicion also dispels concerns of mass, arbitrary GPS monitoring. See Marquez, 605 F.3d at 610 (noting that while "wholesale surveillance" by police would raise serious concerns, in that case "there was nothing random or arbitrary about the installation and use of the device"); Garcia, 474 F.3d at 998 (stating that because the police had "abundant grounds for suspecting the defendant," the constitutionality of "programs of mass surveillance of vehicular movements" was not implicated).

Thus, as long as they had reasonable suspicion that defendant's vehicle facilitated defendant's suspected criminal activity, the investigating agents lawfully installed the GPS tracker device on the vehicle and lawfully used the device to track the vehicle's movements on public roads without first obtaining a warrant.[34]

"Reasonable suspicion is a lower threshold than probable cause, and it requires considerably less than proof of wronging by a preponderance of the evidence." United States v. Carpenter, 462 F.3d 981, 986 (8th Cir. 2006) (internal citation omitted). "An officer's suspicion is reasonable if he 'knows particularized, objective facts that lead to a rational

---

[34]Defendant does not challenge Marquez's other requirements, namely, that (1) installation and removal of the GPS tracking device be non-invasive; (2) installation occur while the vehicle is on a public road or other public property; (3) the vehicle travel only on public roadways during the time the device is monitored; and (4) the device be attached and monitored only for a reasonable period of time. Marquez, 605 F.3d at 610. From the facts adduced at the hearings, the undersigned finds that the installation and the removal of the GPS tracking device from defendant's vehicle was non-invasive; installation occurred while the vehicle was on a public street; the vehicle only ever traveled on public roads while being monitored; and the device was attached for a reasonable period of time, approximately two months, as the Marquez court found the duration of approximately six months to be reasonable. See Brief of Appellee at 3–4, United States v. Marquez, 605 F.3d 604 (8th Cir. 2010), available at 2009 WL 2955451 (stating that the GPS tracker device was installed on May 2, 2007, and was removed in October of 2007).

Appellate Case: 13-3253   Page: 46   Date Filed: 02/12/2014 Entry ID: 4123547

inference that a crime is being or has been committed.' " United States v. Gannon, 531 F.3d 657, 661 (8th Cir. 2008) (quoting United States v. Hernandez-Hernandez, 327 F.3d 703, 706 (8th Cir. 2003)).   Whether an officer had a particularized and objective basis for suspecting legal wrongdoing is evaluated under the totality of the circumstances.   United States v. Arvizu, 534 U.S. 266, 273 (2002).   Reasonable suspicion can be based on hearsay information, the tip of a sufficiently reliable informant, or an officer's assessment of a situation made from his or her specialized training.   United States v. Robinson, 670 F.3d 874, 876 (8th Cir. 2012); United States v. Huerta, 655 F.3d 806, 809-10 (8th Cir. 2011).   That any one factor is insufficient to establish reasonable suspicion is not dispositive; "the sum of the factors taken together can amount to reasonable suspicion."   Huerta, 655 F.3d at 809.

In this case, the investigating agents had reasonable suspicion to believe that defendant had engaged in and was engaging in criminal activity, namely, submitting false time sheets to be paid for work not performed.   Prior to installing the GPS tracking device, Agent Comeau interviewed four long-time former employees of the Treasurer's Office, Curtis Royceton, Dan Parsons, Ben Philips, and Harold Miner, each of whom provided information supporting the investigating agents' suspicion.

Royceton told Agent Comeau that there was a "ghost" employee on the Treasurer's Office's payroll whose last name was "Robinson."   Royceton believed that this Robinson was a friend of City Treasurer Larry Williams; that this Robinson was involved in a charter school venture, PA, with Williams; and that this Robinson would perform work for PA during regular business hours at the Lindell Office.   Agent Comeau verified through employment records with the State of Missouri that defendant was a City employee, and verified through PA's website that defendant and Williams were involved with the PA.

Parsons told Agent Comeau that a state audit made him suspicious of a "ghost" employee being on the Treasurer's Office's payroll.   Despite being "very familiar" with the Treasurer's Office's employees, Parsons did not recognize defendant Robinson's name or photograph.

Ben Philips told Agent Comeau that defendant and Williams were involved with PA and that he believed that defendant worked in an

- 37 -

45

"external security" department as a way to "kick back" money to Williams, because defendant was being paid for work he was not performing.

Harold Minor told Agent Comeau that he believed that Williams used the "external security" department as a way to pay certain individuals, including defendant, a salary without them working and without being detected.   Miner also told Agent Comeau that he believed that defendant performed no work, never drove a City vehicle, and went to the Treasurer's Office only to pick up his paychecks.

Surveillance by Agent Comeau on December 8-9, 2009, and January 11-15, 2010, and by Agent Comeau, Agent Kenny, and Agent Meyer on January 19-21, 2010, corroborated their suspicion that defendant was submitting false time sheets.   During none of these times, which were all weekdays, was defendant observed at the Treasurer's Office, nor did defendant appear to be performing work for the Treasurer's Office; frequently, defendant appeared to be performing work for PA.

From this information, the undersigned concludes that the investigating agents had a reasonable suspicion that defendant Robinson had previously engaged in and was currently engaging in criminal activity.   The agents believed that tracking the movements of defendant's vehicle would enable them to confirm or dispel their suspicion.   By tracking defendant's vehicle, the agents would be able to observe defendant's daily pattern accurately and cost-effectively.

Therefore, the agents did not need to obtain a judicial warrant prior to installing the GPS tracker device on defendant's vehicle and using the device to monitor the vehicle's movements.   The evidence obtained from the GPS tracker device should not be suppressed for lack of reasonable suspicion.

### 3.  Seizure

A "seizure" of property occurs under the Fourth Amendment when "there is some meaningful interference with an individual's possessory interest in that property." Karo, 468 U.S. at 712 (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)) (internal quotation marks omitted).   Whether there was a physical trespass is "only marginally relevant to the question of whether the Fourth Amendment has been

- 38 -

Appellate Case: 13-3253   Page: 48   Date Filed: 02/12/2014 Entry ID: 4123547

violated, . . . for an actual trespass is neither necessary nor sufficient to establish a constitutional violation." Id. at 712–13.

The installation of the GPS tracker device onto defendant's vehicle was not a Fourth Amendment seizure. Defendant's vehicle was parked on a public street when agents affixed the GPS tracker device to the vehicle. The GPS tracker device's presence did not deprive defendant his dominion and control of the vehicle, nor did the GPS tracker device's presence interfere with the electronic components of the vehicle, draw power from the vehicle, take up room that may have otherwise been occupied by passengers or packages, or alter the vehicle's appearance. As Justice Alito stated in his concurring opinion in Jones, there is no Fourth Amendment seizure under these circumstances. See Jones, 132 S. Ct. at 958 (Alito, J., concurring) (noting that the majority "[did] not contend that there was a seizure" and, indeed, there was no seizure, as "the success of the surveillance technique that the officers employed was dependent on the fact that the GPS did not interfere in any way with the operation of the vehicle, for if any such interference had been detected, the device may have been discovered"). See also Garcia, 474 F.3d at 996 (holding that there was no Fourth Amendment seizure under similar circumstances because "[t]he device did not affect the car's driving qualities, did not draw power from the car's engine or battery, did not take up room that might otherwise have been occupied by passengers or packages, [and] did not even alter the car's appearance").

Therefore, defendant's motion to suppress based on a Fourth Amendment seizure should be denied.

**B.  First Amendment**

Defendant Robinson argues that the government's use of the GPS tracker device violated his First Amendment right to keep his associations private, citing NAACP v. Alabama[35] and Maynard. Defendant also argues that the Fourth Amendment's protection of privacy rights also protects First Amendment associational rights, citing Katz.

―――――――――――

[35]357 U.S. 449, 462 (1958).

- 39 -

47

The courts that have addressed similar arguments have held that evidence obtained from GPS surveillance should not be suppressed on First Amendment grounds. <u>See, e.g.</u>, <u>United States v. Walker</u>, 771 F. Supp. 2d 803, 813 n.9 (W.D. Mich. 2011) (rejecting the defendant's argument that restricting "a First Amendment freedom constitutes a Fourth Amendment search or seizure"); <u>United States v. Sparks</u>, 750 F. Supp. 2d 384, 387 n.5 (D. Mass. 2010) (rejecting the defendant's argument for suppression based on a purported violation of his First Amendment right to free association because "[t]he exclusionary rule is a judicial remedy for violations of the Fourth Amendment, not the First Amendment").

Moreover, as discussed above, the agents' warrantless installation and use of the GPS tracker device did not violate defendant's Fourth Amendment rights because the agents reasonably believed that defendant was engaging in criminal activity; to the extent the exclusionary rule could apply, the good-faith exception of <u>Davis</u> would similarly apply.

Therefore, to the extent that the First Amendment could be implicated[36] and the exclusionary rule could be applicable, suppression is not warranted on First Amendment grounds.

### V. CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that the motion of the government for leave to present additional evidence relating to reasonable suspicion (Doc. 61) is sustained.

**IT IS HEREBY RECOMMENDED** that the motions of defendant Fred W. Robinson to dismiss (Docs. 25, 52, 66) be denied.

**IT IS FURTHER RECOMMENDED** that the motions of defendant to sever (Docs. 26, 78) be denied without prejudice, to be refiled upon a sufficient showing of prejudice at trial.

---

[36]<u>See</u> <u>Jones</u>, 132 S. Ct. at 956 (Sotomayor, J., concurring) ("Awareness that the Government may be watching chills associational and expressive freedoms."); <u>In re Application of the United States</u>, ___ F. Supp. 2d ___, No. 10-2188-SKG, 2011 WL 3423370, at *9 n.5 (D. Md. Aug. 3, 2011) (noting that "[s]ome courts and commentators have suggested that prolonged surveillance might also implicate the subject's First Amendment rights of freedom of association").

- 40 -

48

Appellate Case: 13-3253     Page: 50     Date Filed: 02/12/2014 Entry ID: 4123547

**IT IS FURTHER RECOMMENDED** that the motion of defendant for change of venue (Doc. 68) be denied without prejudice, to be renewed upon a sufficient showing of actual prejudice after venire panel voir dire.

**IT IS FURTHER RECOMMENDED** that the motions of defendant to suppress evidence (Docs. 27, 67) be denied.

The parties are advised that they have until close of business on June 8, 2012, to file objections to this Report and Recommendation.  The failure to file timely objections may waive the right to appeal issues of fact.

_____/S/____David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on May 24, 2012.

- 41 -

49

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. S2-4:11CR00361AGF(DDN) |
| | ) | |
| FRED W. ROBINSON, | ) | |
| | ) | |
| Defendant. | ) | |

## **ORDER**

This matter is before the Court on the pretrial motions of Defendant Fred W. Robinson.  Defendant has filed motions to dismiss the indictment, to sever counts for separate trial, to suppress GPS evidence, and for a change of venue.  Pretrial matters were referred to Magistrate Judge David D. Noce.  The Magistrate Judge recommended in his Second Pretrial Order and Recommendation ("Second R&R"; Doc. No. 83), that these motions should be denied.  Defendant filed objections to the Second R&R.

I have conducted a *de novo* review of the motions, including careful review of the evidence before the Magistrate Judge and the arguments of the parties.  The facts, for the most part, are not in dispute, and I agree entirely with the factual findings of the Magistrate Judge, and independently reach the same credibility determinations.  In summary, I conclude that Judge Noce's extensive report correctly sets out the facts and the law applicable to the case.  I agree with and accept his conclusions with respect to Defendant's motions to dismiss, to sever, and for a change of venue and agree that Defendant's motions should be denied.  I find that the current indictment properly states

50

offenses under the federal law, that the statute is constitutional, and that the Court has

jurisdiction of the offenses.  Joinder of the offenses is also proper, and on the current

record, severance is not warranted.  Nor is a change of venue warranted based on pretrial

publicity.

I find that Defendant's Fourth Amendment rights were not violated by the

warrantless installation and operation of a GPS tracker, which activity took place prior to

the Supreme Court's decision in *United States v. Jones*, 132 S. Ct. 945 (2012), and that

the evidence obtained from the GPS device should not be suppressed.  I do differ with the

analysis in the Second R&R in one respect, as I do not believe that the Supreme Court's

decision in *Davis v. United States*, 131 S. Ct. 2419 (2011), provides a good faith

exception to the exclusionary rule in this particular case.  That disagreement does not

change the result, however, as I agree with Judge Noce's conclusion that because the

agents had reasonable suspicion, Eighth Circuit law provides that there is no Fourth

Amendment violation.

## Procedural Background

The procedural background and evidence are set forth fully in the Second R&R,

and will only be summarized here as necessary.  On September 8, 2011, the grand jury

returned an eight count indictment charging Defendant with one count of wire fraud, in

violation of 18 U.S.C. § 1343, and two counts of federal program theft, in violation of 18

U.S.C. § 666, related to an alleged scheme involving the operation and funds of Paideia

Academy; and five counts of federal program theft related to Defendant's employment

with the St. Louis Treasurer's Office.  Counts 4-8 asserted that Defendant was an

2

51

employee of the Treasurer's Office for the City of St. Louis, which organization received

the requisite amount of federal funds through contracts with the United States District

Court and the United States Bankruptcy Court, and that Defendant had embezzled, stole,

or obtained by fraud, funds under the custody or control of the Treasurer's Office for the

City of St. Louis.

Defendant filed motions to dismiss and to sever Count I from the remaining

counts. Defendant also filed a motion to suppress the GPS evidence obtained from a

tracking device installed on his vehicle, asserting that it constituted a search and seizure

in violation of his Fourth Amendment rights. The motions were referred to the

Magistrate Judge, and after an evidentiary hearing on December 1, 2011, the Magistrate

Judge issued a Report and Recommendation ("R&R") recommending the denial of the

motions.

On January 23, 2012, shortly after the issuance of the R&R, the Supreme Court

issued its opinion in *Jones*, holding that the installation and operation of a GPS tracking

device on Jones's car constituted a search within the meaning of the Fourth Amendment.

In February 2012, Defendant filed another motion to dismiss, asserting that the Court

lacked subject matter jurisdiction over Counts 4-8. The matter was then referred back to

the Magistrate Judge for a report and recommended disposition on the newly filed motion

to dismiss, and a supplemental report and recommendation regarding the motion to

suppress, in light of the Supreme Court's opinion in *Jones*.

On February 23, 2012, a superseding indictment was returned, in which Defendant

was again charged with one count of wire fraud (Count 1), and two counts of federal

3

52

program theft (Counts 2 and 3) related to the funds of Paideia Academy.  Counts 4-8

again charged Defendant with federal program theft, but asserted that Defendant was an

"agent" of the City of St. Louis, as an employee of the Treasurer's Office, which

organization received the requisite federal funds through grants from the United States

Department of Housing and Urban Development.

The Magistrate Judge allowed Defendant time to determine whether to file

additional pretrial motions.  Defendant thereafter filed a motion to dismiss counts 4-8 of

the superseding indictment for lack of subject matter jurisdiction, a motion to suppress

the government's use of GPS evidence in light of *Jones*, and a motion to change venue or

transfer the case.  Defendant subsequently filed a motion to sever, this time asserting that

Counts 1-3 (related to Paideia Academy) should be severed for separate trial from Counts

4-8 (related to the St. Louis Treasurer's Office).   The Magistrate Judge also granted the

motion of the United States to present additional evidence on the issue of reasonable

suspicion, and a supplemental evidentiary hearing was held on April 12, 2012.  The

Magistrate Judge thereafter filed the Second R&R (Doc. No. 83), recommending the

denial of all motions, which replaced in its entirety the R&R.

Defendant filed objections to the Second R&R objecting to each of the legal

conclusions asserted therein.  Two days later, the American Civil Liberties Union

Foundation and the ACLU of Eastern Missouri (jointly, the "ACLU") filed a motion for

leave to file an amici curiae brief regarding Defendant's motion to suppress evidence, and

specifically arguing in favor of location privacy.  The United States took no position with

respect to the request, and I granted the motion and permitted the United States to

4

Appellate Case: 13-3253   Page: 55   Date Filed: 02/12/2014 Entry ID: 4123547

respond.  After thorough briefing by all parties and by the ACLU, I granted Defendant's motion for oral argument and held oral argument on Defendant's motions and objections to the Second R&R.

Most recently, on October 3, 2012, a second superseding indictment was filed. Count 1 was changed to allege a slightly earlier ending date for the scheme to defraud, and the amount of Paideia funds disbursed for allegedly improper purposes were slightly increased.  Counts 4-8, which previously alleged that Defendant was an agent of "an organization" (namely the City of St. Louis as an employee of the Treasurer's Office), was changed to allege that Defendant was an agent of "a local government" (again, the City of St. Louis as an employee of the Treasurer's Office).  After the second superseding indictment was filed, Defendant advised the Court that he did not need additional time to evaluate whether to file additional motions directed to the amended indictment. Defendant orally reasserted his previously filed motions, and confirmed that he did not wish to amend or supplement his motions as a result of the superseding indictment.  As such, the motions and objections are now ripe for determination.

## Discussion

When a party objects to a report and recommendation concerning a dispositive matter or a motion to suppress in a criminal case, the Court is required to "'make a de novo review determination of those portions of the record or specified proposed findings to which objection is made.'"  *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (quoting 28 U.S.C. § 636(b)(1)).  When a party objects to orders on nondispositive matters, "[t]he district judge must consider timely objections and modify or set aside any

5

54

part of the order that is contrary to law or clearly erroneous." Rule 59(a), Fed. R. Cr. P.
I have conducted such a *de novo* review, including a review of the hearings and
transcripts and the arguments of the parties.

### A. The Indictment

In Counts 1-3, the current indictment charges that Defendant was the Chairman of
the Board of Trustees of the Paideia Academy ("Paideia), a tuition-free Missouri Charter
School for grades K-8, sponsored by the Missouri University of Science and Technology,
until its charter was cancelled in 2010. Paideia was a wholly-owned subsidiary of the
Paideia Corporation, a nonprofit corporation. Paideia was funded by substantial Federal
education funds and Missouri education funds intended for legitimate school operations.
Defendant maintained an office at Paideia's administrative office and was involved in the
day-to-day operations.

Separate from Paideia, Defendant and a friend organized and incorporated Paige
C. Investments, LLC, for the purpose of operating a day care center to be called The
Little People's Academy. Defendant and his friend planned to operate the day care center
in a building on West Florissant Avenue.

The indictment alleges that beginning on or about April 1, 2009, and continuing
through at least November 10, 2010, Defendant devised a scheme to defraud and to
obtain money from the State of Missouri and the United States by means of false
pretenses. As part of the scheme, Defendant directed that a resolution be passed by the
Paideia Board of Trustees approving a purported loan of Paideia funds to the Little
People's Academy to acquire and rehab the building at West Florissant for the operation

6

55

of a day care center.  In violation of the Paideia's bylaws, however, Defendant failed to advise the Board of Trustees of his financial interest in the transaction or that he was a co-owner of Paige C. Investment, LLC, the company that was to operate the day care center.

In furtherance of the scheme, on approximately September 11, 2009, Defendant directed and authorized the purchase of the West Florissant property using Paideia funds, in the amount of $22,333, which consisted of Federal and Missouri education funds.  And from approximately September 18, 2009, through June 24, 2010, Defendant directed and authorized the payment of approximately $159,700 of Paideia funds, again consisting of Federal and Missouri education funds, for the construction, renovation, and rehabilitation of the building, for the purpose of developing the Little People's Academy.

On approximately June 15, 2010, the Missouri Department of Education determined not to approve Paideia's application for a continuing charter to operate its K-8 campuses.  After it lost its charter, Defendant opened a bank account in the name of Paideia Corporation, West Florissant Capital Improvement, and continued to authorize the transfer of hundreds of thousands of dollars of Paideia's funds to the account and for the renovation of the building.  The use of Paideia's Federal and Missouri education funds for the purchase, construction, and rehabilitation of the West Florissant property was never disclosed to or authorized by the United States Department of Education, the Missouri Department of Elementary and Secondary Education, or the Missouri University of Science and Technology.

Appellate Case: 13-3253   Page: 58   Date Filed: 02/12/2014 Entry ID: 4123547

Count 1 asserts a claim of wire fraud, related to the fax transmission of an invoice

from Paideia related to the construction and rehabilitation.  Counts 2 and 3 assert charges

of federal program theft, in violation of 18 U.S.C. § 666(a)(1)(A), for the periods from

May 1, 2009 to April 30, 2010, and May 10, 2010 to April 30, 2011, respectively, related

to the diversion of funds from Paideia for the construction and development of the child

care facility to be operated by Defendant.

Counts 4-8 assert charges of federal program theft related to the City of St. Louis.

The indictment charges that in each of the years 2006 to 2010, Defendant was an agent of

a "local government," namely the City of St. Louis, as an employee of the Treasurer's

Office, and that the City received in excess of $10,000 in grants from the United States

Department of Housing and Urban Development ("HUD").  It further charges that in each

of these years, Defendant embezzled, stole, or fraudulently obtained funds of at least

$5,000 owned or under the custody or control of the City of St. Louis, by submitting false

weekly time sheets falsely certifying hours worked, and that the City of St. Louis paid the

amount of $35,360 in each year based on the false time sheets, in violation of 18 U.S.C. §

666(a)(1)(A) and (a)2.

**B.  Motion to Dismiss**

Defendant asserts that Counts 4-8 of the Indictment should be dismissed for lack

of federal jurisdiction.  Defendant contends that the statute was intended to address

agencies with responsibility to administer federal funds, and that neither the Parking

Division of the Treasurer's Office nor Defendant had any authority to do that.  Defendant

also contends that he is not an "agent" within the meaning of § 666, because the

8

Appellate Case: 13-3253     Page: 59     Date Filed: 02/12/2014 Entry ID: 4123547

prosecution has no evidence that Defendant had any *authority* to act on behalf of the Treasurer's Office, nor any evidence that Defendant had *authority or access* to any federal funds or the HUD grant. Defendant contends that the Treasurer's Office is an independent elective office, that revenues from parking meters, garages, and parking enforcement paid the salaries of the employees of the Treasurer's Office, and that there is not a sufficient nexus between the alleged criminal conduct and the agency receiving the federal benefits.

Based on a review of the record, I find no basis to dismiss the charges. It is unclear whether Defendant continues to question the authority of Congress to enact 18 U.S.C. § 666, but in any event I agree with the Magistrate Judge that Congress has such authority under the Spending Clause and the Necessary and Proper Clause. *See Sabri v. United States*, 541 U.S. 600, 605-06 (2004). I also find that the statute may properly be applied where, as here, the defendant is alleged essentially to be a "ghost" employee. The exception in the statute for wages paid in the ordinary course of business does not apply here, as one who submits weekly time sheets falsely certifying time worked to obtain a salary payment, when in fact no work is performed, is not receiving a "bona fide salary, wages or fee" and is not being paid in the "usual course of business" within the meaning of 18 U.S.C. § 666(c). *See United States v. Baldridge*, 559 F.3d 1126, 1139 (10th Cir. 2009).

I am also unpersuaded that the indictment must be dismissed at this stage for lack of jurisdiction. As set forth more fully in the Second R&R, the indictment alleges each of the requisite elements of the charge, namely that (1) Defendant was an agent of a local

Appellate Case: 13-3253   Page: 60   Date Filed: 02/12/2014 Entry ID: 4123547

government (the City of St. Louis); (2) during the period charged, Defendant embezzled, stole, fraudulently obtained, knowingly converted without authority, or intentionally misapplied property valuing $5,000 or more; (3) the property was owned by, or under the care, custody, or control of the local government; and (4) the local government received in excess of $10,000 in the one-year period charged, pursuant to a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of federal assistance. *See* Eighth Circuit Model Jury Instruction (Criminal) § 6.18.666A (2011).

In his motion to dismiss, Defendant asks me to determine what is essentially a factual matter: that the relationship between the Treasurer's Office and the City of St. Louis is such that Defendant cannot be deemed to be an agent of the City of St. Louis. In reviewing a motion to dismiss, the allegations of the indictment must, at this stage, be accepted as true. *United States v. Sampson*, 371 U.S. 75, 78-79 (1962). Here, the grand jury has returned a superseding indictment that plainly alleges each of the elements of an offense under 18 U.S.C. § 666(a)(1)(A). The indictment is also facially sufficient as it contains the essential elements of the offense, fairly informs Defendant of the charges, and alleges sufficient information for Defendant to raise a Double Jeopardy challenge to a subsequent prosecution. *See United States v. Sohn*, 567 F.3d 392, 394 (8th Cir. 2009). The prosecution will need to meet its burden to establish, beyond a reasonable doubt, that the allegations contained in the indictment are true.

At bottom, Defendant is asking me to determine, based on the evidentiary information he has submitted, that the prosecution will be unable to prove its case. The Eighth Circuit has recognized, however, that "federal criminal procedure does not

10

59

'provide for a pre-trial determination of sufficiency of the evidence.'" *United States v. Ferro*, 252 F.3d 964, 968 (8th Cir. 2001) (quoting *United States v. Critzer*, 951 F.2d 306, 307-08 (11th Cir. 1992)).  A dismissal on this ground is therefore inappropriate at this stage where, as here, the indictment is sufficient on its face.

Defendant's further argument, that he cannot be regarded as an "agent," fails for a similar reason.  In his briefs, and more directly at oral argument, Defendant asserted that he cannot be an "agent" within the meaning of the statute because the prosecution's evidence will be that Defendant had no actual job and no actual duties at the Treasurer's Office.  Although the argument has some surface appeal, the fact that an employee or agent does not perform his duties does not mean that he ceases to be an "employee."  Nor does an employee's failure to work mean that he lacks the *ability* to bind, in some meaningful way, the entity that is paying him.  Here, too, the question of whether Defendant is an "agent" is properly a matter for proof at trial.

As such, Defendant's objection to the Magistrate Judge's recommendation that Defendant's motion to dismiss be denied is overruled, and the Court adopts and incorporates the Second R&R on this ground.

### C.  Motion to Sever

Defendant asserts that joinder of the counts related to the fraud involving Paideia with those involving the City of St. Louis is improper, and also that the prejudice to Defendant from a joint trial of the offenses requires severance under Rule 14, Fed. R. Cr. P.  I agree with the Magistrate Judge that *United States v. Bledsoe*, 674 F.2d 647, 655

Appellate Case: 13-3253   Page: 62   Date Filed: 02/12/2014 Entry ID: 4123547

(8th Cir. 1982), remains good law in this Circuit, and that the propriety of joinder is judged based on the face of the indictment.

Here, joinder is proper under Rule 8, Fed. R. Crim. P., because the offenses are of the same or similar character. In applying this standard, the Eighth Circuit has "'found joinder of offenses to be proper when the two counts refer to the same type of offenses occurring over a relatively short period of time, and the evidence as to each count overlaps.'" *United States v. Garrett*, 648 F.3d 618, 625 (8th Cir. 2011) (quoting *United States v. Robaina*, 39 F.3d 858, 861 (8th Cir.1994) (citations and quotations omitted)). In *Garrett*, the Court found joinder was proper where the defendant was charged with two counts of being a felon in possession of a firearm, occurring approximately 15 months apart, one related to a firearm allegedly thrown from a car and the other related to a firearm found in the search of a residence that was owned by another, where the defendant apparently stayed when he visited his girlfriend there.

Here the similarity is even greater than in *Garrett*. Defendant is alleged to have engaged in two fraudulent schemes, both involving frauds upon his employers and the submission of fraudulent documents or representations, and the schemes overlap for two of the five years at issue. Further, evidence of Defendant's employment at Paideia is extremely relevant to the City of St. Louis charges. Thus, for the reasons set forth more fully in the Second R&R, I find joinder to be proper.

Nor do I believe that Counts 1-3 should be severed for separate trial under Rule 14(a), as Defendant also requests. As the Magistrate Judge noted, joint trials are favored because they "conserve state funds, diminish inconvenience to witnesses and public

Appellate Case: 13-3253   Page: 63   Date Filed: 02/12/2014 Entry ID: 4123547

authorities, and avoid delays in bringing those accused of crime to trial." *United States v. Lane*, 474 U.S. 438, 449 (1986) (quotations omitted).  Rule 14(a) allows for severance of properly joined "[i]f it appears that a defendant . . . is prejudiced by a joinder of offenses."  "Prejudice may result from a possibility that the jury might use evidence of one crime to infer guilt on the other or that the jury might cumulate the evidence to find guilt on all crimes when it would not have found guilt if the crimes were considered separately." *United States v. Davis*, 103 F.3d 660, 676 (8th Cir. 1996).  However, "a defendant does not suffer any undue prejudice by a joint trial if the evidence is such that one crime would be probative and admissible at the defendants' separate trial of the other crime." *Id.*  The Eighth Circuit has recognized that "[t]he presumption against severing properly joined cases is strong." *United States v. Ruiz*, 412 F.3d 871, 886 (8th Cir. 2005).  And "the possibility that a defendant's chances for acquittal may be better in separate trials is an insufficient justification for severance." *Id.* at 887

Here, the prosecution's case involving the two schemes will involve a fair amount of overlap of evidence and witnesses, as evidence of Defendant's activities at Paideia will be relevant to fraud charges involving the City of St. Louis.  Defendant has conceded that such overlap may occur in a separate trial of Counts 4-8, but contends that no evidence of the fraudulent conduct involving the City of St. Louis would be admissible in a separate trial of Counts 1-3.  Even assuming that were the test to be applied, the Court is unpersuaded, as evidence of the fraudulent conduct involving the City of St. Louis during the very same time period would likely be admissible in a separate trial of Counts 1-3 under Fed. R. Evid. 404(b).  *See United States v. Jewell*, 614 F.3d 911, 922 (8th Cir.

Appellate Case: 13-3253   Page: 64   Date Filed: 02/12/2014   Entry ID: 4123547

2010) (finding no abuse of discretion in allowing the prosecution to introduce evidence of a separate tax evasion scheme in which the defendant participated to establish his intent to engage in the charged tax evasion scheme).  While there is some risk of prejudice, the evidence can be sufficiently compartmentalized to avoid confusion by the jury, and any possible prejudice from spillover can be properly addressed through jury instructions.

### D.  Motion for Change of Venue

Defendant has moved for a change of venue pursuant to Rule 21(a), Fed. R. Crim. P., based on news stories which he asserts create prejudice against him and make it unlikely that he can receive a fair trial in this district.  I agree with the findings and reasoning set forth in the Second R&R, and for the reasons set forth more fully by the Magistrate Judge, I independently find that Defendant's motion has no merit.  I have examined the record and I agree that the pretrial publicity in this case has not been at all extensive, and find that the news articles submitted were objective and were not inflammatory.  Thus, Defendant has not shown that a change of venue is warranted based on pretrial publicity in this case. *See United States v. Nelson*, 347 F.3d 701, 707-08 (8th Cir. 2003).  The matter can be reexamined at a later stage should the voir dire examination suggest such prejudice does, in fact, exist.

### E.  Motion to Suppress GPS Evidence

In the Second R&R, the Magistrate Judge provided a detailed and thorough recitation of the facts related to the motion to dismiss.  Based upon my review of the evidence presented at the evidentiary hearings on December 1, 2011, and April 12, 2012,

I find the factual findings in the report to be accurate, and I adopt them in their entirety.

In summary, the evidence establishes the following facts:

### Initial Investigation

The investigation regarding Defendant began in October 2009, after Special Agent ("SA") Monique Comeau, who has been an agent with the FBI for approximately 17 years, interviewed Curtis Royston, a former employee with the St. Louis City Treasurer's Office. He had been a Human Resources Personnel Analyst with the Treasurer's Office, and he provided SA Comeau with information about work hours and payroll procedures. He also advised her that a "ghost" employee, whose last name was Robinson, was on the Treasurer's Office payroll. Royston further stated that Robinson was an associate of the Treasurer, Larry Williams, and that Williams and Robinson were involved in a charter school named Paideia Academy. Following some initial surveillance of Defendant, SA Comeau re-interviewed Royston and obtained further information about the operations of the Treasurer's Office. In these interviews, Royston also advised her that at times Williams required Royston to go to Paideia's office on Lindell Boulevard to perform work on Paideia's computer system. While at the Lindell office, he was introduced to Robinson, who was working in the Lindell office on Paideia matters, and he advised the agent that he had seen Robinson at the Lindell office several times, during the normal work day, working on Paideia matters.

Following the interviews, SA Comeau verified through employment records with the State of Missouri that Defendant was an employee of the City of St. Louis. She also determined through her investigation of records that Defendant was listed as the

15

64

Chairman of the Paideia Board of Trustees, and that Williams was also a member of the

Paideia Board of Trustees.  Soon thereafter, SA Comeau contacted Assistant United

States Attorney ("AUSA") Hal Goldsmith, who informed her that certain other

individuals had contacted the United States Attorney's office regarding the Treasurer's

Office.

In December 2009, SA Comeau interviewed three other former employees of the

Treasurer's Office, who provided information corroborating the information she had

previously received suggesting that Defendant was receiving a paycheck, but not actually

performing work.  These individuals had been long-time employees who were in a

position to know if Defendant had actually been performing work for the office.  Some of

these individuals also advised her that there had also been other employees who received

paychecks, but did little or no work.  At the time she interviewed these three former

employees, SA Comeau was aware that they had filed a lawsuit against the Treasurer's

Office related to their terminations.

On December 8-9, 2009, January 11-15, 2010, and January 19-21, 2010, SA

Comeau and other FBI agents conducted surveillance of Defendant and his vehicle.  This

surveillance further corroborated the information she received.  Defendant's car was

observed at Paideia during the workday, and at his residence at night.  At no time was he

observed performing work for the Treasurer's Office of the City of St. Louis.

From the record as a whole, I also conclude, as did the Magistrate Judge, that by

January 21, 2010, prior to installing the GPS tracking device, SA Comeau had reasonable

suspicion that Defendant was engaged in fraudulent conduct, including federal program

theft, with respect to the receipt of salary payments from the Treasurer's Office of the City of St. Louis. Defendant's objections to the finding of reasonable suspicion are unpersuasive. I do not accept Defendant's suggestion that the information from the prior employees was not entitled to any weight because they had filed a lawsuit related to their terminations. SA Comeau was aware of the lawsuit prior to interviewing the employees. She conducted face-to-face interviews with the prior employees, and as an experienced agent, was in a position to assess their credibility. The information provided by each employee also supported and corroborated the information received from the others. And the information received from the interviews was further corroborated by the records reviewed and by the surveillance conducted.

Defendant also takes issue with the fact that SA Comeau did not subpoena the payroll records and other records from the Treasurer's Office (which could have alerted the Treasurer to the investigation), and that the surveillance did not rule out other possible explanations, such as that Defendant was on vacation. But these facts do not undercut the existence of reasonable suspicion on this record. Officers are not required to have all of the facts or rule out every innocent explanation for a suspect's conduct before they are deemed to have reasonable suspicion that criminal conduct is occurring. And though each factor might appear to be innocent when viewed alone, the combination of such factors may give rise to reasonable suspicion. *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002); *United States v. Bloomfield*, 40 F.3d 910, 918 (8th Cir. 1994).

Appellate Case: 13-3253   Page: 68   Date Filed: 02/12/2014 Entry ID: 4123547

### Installation of the GPS Tracking Device

Throughout the investigation, SA Comeau maintained frequent contact with the AUSA. On January 14, 2010, SA Comeau met with the AUSA to discuss the possibility of attaching a GPS tracker device to Defendant's vehicle, to provide further evidence of how Defendant was spending his time. The decision to affix the GPS tracker device without judicial authorization was made by the agent, the AUSA, another Special Agent with the FBI, FBI Chief Division Counsel Craig Sieverson, and the then-Assistant FBI Special Agent in Charge. Based on these discussions, I find that SA Comeau subjectively believed that judicial authorization to attach a GPS tracker to a vehicle was not required by the then-current law.

During the early morning hours of January 22, 2010, to facilitate the physical surveillance of Defendant's movements, the agents surreptitiously affixed a GPS tracker on Defendant's vehicle while it was parked on a public street. It was a small device, with its own battery supply, and was not "hard wired" into the vehicle's battery or electrical system. The GPS tracker could not determine who was driving the vehicle or observe the interior of the vehicle. It operated with an antenna that required access to the sky to operate, and thus could not collect and record data in a garage or other covered enclosure. At no time while the GPS tracker was collecting and recording data was Defendant's vehicle located in a private garage or other enclosure; rather, it was always in a location open to public view.

The GPS tracker obtained and recorded data regarding the location of Defendant's vehicle until approximately March 17, 2010, when the device stopped recording. The agents thereafter removed the device while the vehicle was parked on a public street.

**Discussion**

Defendant asserts that under the Supreme Court's opinion in *Jones*, a warrant is required prior to placement of a GPS device, and that the failure to obtain a warrant in this case requires suppression of the evidence obtained from the GPS tracking device. He contends that neither the existence of reasonable suspicion nor even probable cause impact the requirement to obtain a search warrant prior to installation of such a device on a suspect's vehicle.

The prosecution counters that the good faith exception to the exclusionary rule should apply because the "controlling law of the land" at the time the device was installed and used was that no warrant was required to install a GPS tracker of this type while the vehicle was on public streets or to monitor the information that tracked the vehicle while in public view. The prosecution relies on the Supreme Court decisions in *United States v. Knotts*, 460 U.S. 276, 281 (1983), and *United States v. Karo*, 468 U.S. 705, 715 (1984), and decisions from the Seventh and Ninth Circuits. The prosecution argues that under *Davis v. United States*, 131 S. Ct. 2419, 2423-24 (2011) (holding that "searches conducted in objectively reasonable reliance on binding appellate precedent [that is later overruled] are not subject to the exclusionary rule"), the exclusionary rule does not apply, as the agents relied upon and strictly adhered to the then-controlling appellate court opinions. The prosecution also relies on an opinion of the Eighth Circuit Court of

Appellate Case: 13-3253    Page: 70    Date Filed: 02/12/2014 Entry ID: 4123547

Appeals, issued several months following the use of the GPS tracking device in this case,
*United States v. Marquez*, 605 F.3d 604 (8th Cir. 2010), and asserts that under *Marquez*,
no warrant is required where, as here, the agents had reasonable suspicion to believe the
target is involved in criminal activity.

The Magistrate Judge agreed with both of the prosecution's arguments, and
recommended that the evidence not be suppressed.  The Magistrate Judge found that the
*Knotts* and *Karo* cases and authority from other circuits, as confirmed by the later opinion
in *Marquez*, provided controlling authority within the meaning of *Davis*, and that the
agents' conduct was in strict compliance with that authority, and therefore suppression
was not appropriate under *Davis*.  The Magistrate Judge also recommended that as the
agents had reasonable suspicion, no warrant was required.  Defendant objects to both of
these conclusions.

1. **The Good Faith Exception**

In *Jones*, the Supreme Court, in January of this year, held that the government's
"installation of a GPS device on a target's vehicle, and its use of that device to monitor
the vehicle's movements, constitutes a 'search' within the meaning of the Fourth
Amendment."  *Jones*, 132 S. Ct. at 945.  Notably, the majority did not rely on the
"reasonable expectation of privacy" test routinely applied by the courts since it was
established in *Katz v. United States*, 389 U.S. 347 (1967).  Justice Scalia, in an opinion
joined by four other Justices, instead held that *Katz* had not displaced the common law
trespass theory underlying the Fourth Amendment, and that attachment of a GPS in order
to obtain information constituted a search within the meaning of a common law

Appellate Case: 13-3253    Page: 71    Date Filed: 02/12/2014 Entry ID: 4123547

trespassory theory. The majority expressed, for the first time, that the *Katz* "reasonable expectation of privacy" test simply supplemented and did not displace the long-standing trespass theory that existed in the Eighteenth Century.

But *Jones* left open several important issues. The Court did not decide whether officers must in all circumstances obtain a search warrant, and if not, what degree of suspicion (probable cause, reasonable suspicion) would support a warrantless search. *Id.* at 954. The Court also did not decide whether, if a violation occurred, the exclusionary rule would require suppression or what such evidence must be suppressed. *Id.* at 964 n. 11. The United States argues I need not reach those issues in this case, because the good faith exception to the exclusionary rule applies.

The parties here do not dispute that under *Jones*, the attachment of the GPS device on Defendant's car constitutes a Fourth Amendment "search." They also do not dispute the ability of Defendant to rely on *Jones* for this proposition, even though it was decided after the conduct in question. *See Davis*, 131 S. Ct. at 2436 (Breyer, J., dissenting); *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987). But it does not necessarily follow that suppression of the evidence obtained is warranted. As the Magistrate Judge correctly noted, suppression is not an automatic consequence of a Fourth Amendment violation. The exclusionary rule is judicially created, as a "deterrent sanction," and numerous exceptions to the exclusionary rule have been recognized. *Davis*, 131 S. Ct., at 2426-27.

The United States contends that the conduct of the agents here falls within the good faith exception to the exclusionary rule expressed in *Davis*. In that case, officers conducted a vehicle search in compliance with then-existing Eleventh Circuit precedent

70

Appellate Case: 13-3253    Page: 72    Date Filed: 02/12/2014 Entry ID: 4123547

interpreting Supreme Court law.  While the appeal of Davis's case was pending, the

Supreme Court decided *Arizona v. Gant*, 556 U.S. 332, 345 (2009), which announced a

new rule governing automobile searches incident to arrests, and the search conducted

plainly violated the defendant's Fourth Amendment rights under the rule announced in

*Gant*.  The Supreme Court addressed the question of whether suppression of the evidence

was required and found that application of the exclusionary rule would serve no proper

deterrent function.  Further extending the "good faith" exception of the *Leon*[1] line of

cases, the Supreme Court held that a search conducted "in objectively reasonable reliance

on then-binding appellate precedent" is not subject to the exclusionary rule.  *Davis*, 131

S. Ct. at 2428, 2434.

Answering the question of whether the good faith exception in *Davis* applies here

requires an examination of the case law as it existed at the time the agents installed the

GPS device on Defendant's car.  Because the cases are thoroughly discussed in the

Second R&R, I will simply summarize them here.

In *Knotts*, decided in 1983, the Supreme Court held that the officers' use of an

electronic beeper, that had been hidden inside of a chemical container prior to coming

into the defendant's possession, to track the defendant's movements as he traveled on

public roads with the container in his car, did not violate the Fourth Amendment, as a

person traveling in a vehicle on public roads had no reasonable expectation of privacy in

his movements.  460 U.S. at 281-82.  One year later, the Court held in *Karo* that the

consensual installation of an electronic beeper in a can, prior to the can coming into the

---

[1]  *United States v. Leon*, 468 U.S. 897 (1984).

Appellate Case: 13-3253     Page: 73     Date Filed: 02/12/2014 Entry ID: 4123547

defendant's possession, was not a search, because the installation itself conveyed no information at all.  468 U.S. at 712.

Prior to the installation of the GPS device on Defendant's car, the Seventh and the Ninth Circuits had both issued opinions that hold that the warrantless installation and use of a GPS tracking device on a suspect's vehicle did not violate the Fourth Amendment. *See United States v. Garcia*, 474 F.3d 994, 996 (7th Cir. 2007) (holding installation of a memory tracking device was neither a seizure nor a search, and that tracking the vehicle on public streets was not a search); *United States v. Pineda-Moreno*, 591 F.3d 1212, 1217 (9th Cir. 2010) (holding, relying on *Knotts*, that the defendant had no expectation of privacy in the exterior of his vehicle and therefore no impermissible Fourth Amendment search occurred by virtue of the officers monitoring the defendant's vehicle with a mobile tracking devices).  No Circuit held otherwise.

On August 12, 2010, several months after the agents removed the GPS device from Defendant's car, the D.C. Circuit decided *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), *aff'd sub nom. United States v. Jones*, 132 S. Ct. 945 (2012).  Rejecting the reasoning of the *Garcia*, *Pineda-Moreno*, and *Marquez* cases, the D.C. Circuit held that the use of a GPS device to track the defendant's movements over the course of a four week period violated the defendant's reasonable expectation of privacy and was a "search" within the meaning of the Fourth Amendment.  615 F.3d at 555.  It reversed the defendant's conviction, finding that the GPS evidence was obtained in violation of his Fourth Amendment rights.  The Supreme Court granted certiorari, issuing its opinion in *Jones* on January 23, 2012.

72

Appellate Case: 13-3253    Page: 74    Date Filed: 02/12/2014 Entry ID: 4123547

Following the decision in *Jones*, courts in the Seventh and Ninth Circuits have applied *Davis* to hold that the exclusionary rule should not apply to suppress evidence obtained in conformity with the *Garcia* and *Pineda-Moreno* cases. *See*, e.g., *United States v. Shelburne*, No. 3:11-cr-156-S, 2012 WL 2344457, at *5-6 (W.D. Ky. June 20, 2012) (applying Seventh Circuit precedent, as acts occurred in Indiana); *United States v. Aquilar*, No. 4:11-cr-298-BLW, 2012 WL 1600276, at *2 (D. Idaho May 7, 2012); *United States v. Nwobi*, No. CR10-952(C) GHK-7, 2012 WL 769746, at *3 (C.D. Cal. Mar. 7, 2012). Likewise, district courts in Minnesota and the Northern District of Iowa have had no trouble determining that the good faith exception applies to avoid the suppression of evidence obtained from installation of a GPS device after *Marquez*, but before *Jones*. *See United States v. Barraza-Maldonado*, No. 12-CR-0054 (PJS/SER), 2012 WL 2952312, at *6-8 (D. Minn. July 19, 2012); *United States v. Amaya*, 853 F. Supp. 2d 818, 830 (N.D. Iowa 2012), *partially withdrawn on other grounds*, 2012 WL 1523045 (N.D. Iowa May 1, 2012).

The question before this Court is whether the *Davis* good faith exception applies where, as here, no Eighth Circuit case law expressly authorized the warrantless installation of a GPS tracker. Since *Jones*, several other district courts have grappled with this issue, and the cases have come down on both sides. To date, I am aware of courts in three districts that have held that the good faith exception to the exclusionary rule applies notwithstanding the absence of express appellate precedent in their Circuits. *See United States v. Rose*, No. 11-100620-NMG, 2012 WL 4215868, at *3-5 (D. Mass. Sept. 14, 2012); *United States v. Oladosu*, Cr. No. 10-056-01 S, 2012 WL 3642851

24

73

(D.R.I. Aug. 21, 2012); *United States v. Baez*, No. 10-10275 DPW, 2012 WL 2914318, at *1 (D. Mass. July 16, 2012); *United States v. Leon*, 856 F. Supp. 2d 1188, 1192-93 (D. Haw. 2012). These courts, applying the broader principles stated in *Davis*, have held that where officers act in objectively reasonable reliance on a comprehensive body of case law, suppression is not required, even in the absence of binding Circuit precedent. *See, e.g.*, *Rose*, 2012 WL 4215868, at *3, 5.

Three districts have taken a contrary view. *See United States v. Ortiz*, No. 11-251-08, 2012 WL 2951391, at *24-25 (E.D. Pa. July 20, 2012); *United States v. Lujan*, No. 2:11CR11-SA, 2012 WL 2861546, at *3 (N.D. Miss. July 11, 2012); *United States v. Lee*, 11-65-ART, 2012 WL 1880621, at *9 (E.D. Ky. May 22, 2012); *United States v. Katzin*, No. 11-226, 2012 WL 1646894, at *9-10 (E.D. Pa. May 9, 2012). These courts hold that *Davis* does not apply in the absence of binding precedent from the Circuit, and that permitting officers to rely on non-binding precedent would allow officers to pick and choose what law to follow, and would not properly serve the deterrent function of the exclusionary rule.

The United States, following reasoning similar to that of the district courts in the first group, asserts that the good faith exception to the exclusionary rule should apply because the "controlling law of the land" at the time the device was installed and used was that no warrant was required to install a GPS tracker of this type while the vehicle was on public streets or to monitor the information that tracked the vehicle while in public view. It contends that courts across the country, relying on the Supreme Court decisions in *Knotts* and *Karo*, reasonably concluded that suspects had no reasonable

25

expectation of privacy in their movements while on public streets. The United States

notes that at the time of the installation of the GPS in this case, two Circuits had taken

this position, and there was no contrary Circuit law at the time. The only Circuit case to

adopt a contrary position, *Maynard*,[2] was not issued until almost five months after the

GPS was removed by the agents in this case.

The United States further asserts that the agents' interpretation of the law was

confirmed by the *Marquez* decision. In *Marquez*, the Eighth Circuit, relying upon *Knotts*,

recognized that "a person traveling via automobile on public streets has no reasonable

expectation of privacy in his movements from one locale to another." *Id.* at 609. Citing

the Seventh Circuit opinion in *Garcia*, the Court further concluded that when police have

reasonable suspicion to believe that a vehicle is involved in criminal activity, "a warrant

is not required when, while the vehicle is parked in a public place, they install a non-

invasive GPS tracking device on it for a reasonable period of time." *Id.* at 610. Though

not issued until after the device was removed here, the United States argues that the

opinion confirms what the general state of the law was at the time the device was

installed, and the reasonableness of the agents' belief as to what the law required. The

Magistrate Judge also adopted this reasoning in the Second R&R, and determined that the

good faith exception of *Davis* applied in light of the generally accepted case law at the

time of the installation of the GPS.

---

[2] *See Oladosu*, 2012 WL 3642851, at *8, for a timeline of the relevant case
authority.

But I do not read *Davis* that broadly, and do not agree that the *Davis* good faith exception applies here.  I recognize that the majority in *Davis* spent much time discussing the rationale underlying the exclusionary rule and the need to balance the societal cost of its application.  The majority noted that the deterrence benefits of exclusion "'var[y] with the culpability of the law enforcement conduct' at issue." *Davis*, 131 S.Ct. at 2427 (quoting *Herring v. United States*, 555 U.S. 135, 143 (2009)).  Thus, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . the deterrence rationale loses much of its force and exclusion cannot pay its way." *Id.* at 2427-28 (internal citations and quotations omitted).

I do not believe, however, that in *Davis* the Supreme Court announced a good faith exception that invites courts to engage in a free-ranging balancing test in the absence of controlling Supreme Court or Circuit authority.  Rather, I agree with the *Ortiz* group of cases, that the holding in *Davis* extends only to "binding" precedent.  The language of *Davis* is narrow, and quite specific.  In discussing whether the police were culpable, the majority in *Davis* noted "the officers' conduct was in strict compliance with then-binding Circuit law." *Davis*, at 2428-29.  The opinion repeatedly references "binding" authority, *see, e.g., id.*, at 2428, 2429, 2431, 2434; the majority did not reference "generally accepted authority."  Indeed, the majority specifically noted that the situation might be different with "defendants in jurisdictions in which the question remains open." *Id.* at 2432; *see also id.* at 2436 (Sotomayor, J., concurring).   The majority also limited its holding to cases where "binding appellate precedent specifically *authorizes* a particular police practice." *Id.* at 2429.

27

Appellate Case: 13-3253   Page: 78   Date Filed: 02/12/2014 Entry ID: 4123547

This narrow extension of the exception is consistent with the *Davis* majority's discussion of the *Leon* good faith exception. The Court traced the case law progression from good faith reliance on a defective warrant issued by a magistrate judge, to good faith reliance on subsequently invalidated statutes, good faith reliance on erroneous information in a database maintained by judicial employees, and good faith reliance on an isolated record in a police database. *Id.* at 2427-28. The Court recognized that in those instances, application of the exclusionary rule would make little sense and would have no real deterrent value. In those situations the errant conduct was that of the judge, the legislature, the court staff, or those charged with maintaining a database, not of the officers who reasonably relied on that information in effecting a search, and the exclusionary rule was not intended to deter the actions of the former group. The Court reasoned that application of the exclusionary rule to the facts in *Davis* would be like "penaliz[ing] the officer for the [appellate judges'] error." *Id.* at 2429 (internal citations omitted).

But the same cannot be said where law enforcement officers reasonably, but erroneously, determine that case law that is neither binding nor directly on point, is sufficient, by extension, to authorize conduct later determined to violate the Fourth Amendment. In such a situation there is no "appellate judge" error, as the appellate court has not yet determined the issue presented. Moreover, as other courts have noted, permitting officers to pick and choose which authority to rely on yields an unworkable framework. Further, application of the exception in the context of unsettled law, would further undermine the Court's decisions on retroactive application of a new rule, a result

Appellate Case: 13-3253   Page: 79   Date Filed: 02/12/2014 Entry ID: 4123547

which, even in the majority's narrow application, concerned the dissent in *Davis*. *See id.* at 2437.

Given this reading of *Davis*, I do not find that at the time the agents in this case installed and monitored the GPS device on Defendant Robinson's car, there was any Circuit precedent expressly authorizing their conduct. The United States has not cited to any such Eighth Circuit precedent. *Knotts* and *Karo*, cited both by the United States and the Magistrate Judge, do not provide such authority. As the Magistrate Judge correctly noted, neither case was overruled by *Jones*, and neither expressly authorized the conduct at issue here.

*Knotts* involved a challenge to the monitoring of a beeper, which involves different technology that does not offer the same type of comprehensive 24-hour per day tracking of movements. The beeper had been placed inside a container with the owner's consent, before it came into Knotts' possession, and Knotts thereafter placed the container in his car and then removed it to an open field. *See Jones*, 132 S. Ct. at 951-52 (discussing *Knotts*). As the Court observed in *Jones*, "Knotts did not challenge that installation, and we specifically declined to consider its effect on the Fourth Amendment analysis." *Id.* at 952 (citing *Knotts*, 460 U.S. at 279).

*Karo* was similar, in that it involved the installation of a beeper in a container, with the consent of the original owner, which was later delivered to a buyer. *Jones*, 132 S. Ct. at 952. The Court found the consensual installation of the beeper was not a problem, because "while creating the potential for an invasion of privacy" it did not

convey any information the defendant wished to keep private, for it conveyed no

information at all.  *Kato*, 468 U.S. at 712.

The need for caution in this age of developing technology should be clear.  Other

Supreme Court cases, by their rulings or their language, have given notice that earlier

pronouncements may not control when the technology changes or the nature and degree

of intrusion changes.  For example, in *Kyllo v. United States*, 533 U.S. 27, 33 (2001), the

Court noted that it had "previously reserved judgment as to how much technological

enhancement of ordinary perception" turned mere observation into a Fourth Amendment

search.  The Court also gave weight to the nature of the device, which was not in general

public use.  *Knotts* also highlighted the limits of its holding, recognizing, based in part on

the limits of the technology then at issue, that "if such dragnet-type enforcement practices

as respondent envisions should eventually occur, there will be time enough then to

determine whether different constitutional principles may be applicable."  *Knotts*, 460

U.S. at 283-84.  Thus, one may not simply assume that prior case law authorizes conduct

when it deals with different technology, is perhaps installed in a different fashion, or

permits a different degree of intrusion.

I do agree that the *Garcia*, *Pineda-Moreno*, and *Marquez* opinions address the

very type of conduct at issue in this case.  I also find that the agents' conduct here strictly

complies with the conduct authorized by these three cases.  But the problem is that the

first two cases were not from the Eighth Circuit, and therefore do not constitute binding

Circuit authority within the meaning of *Davis*, and *Marquez* had not yet been decided at

the time the agents installed and monitored this GPS device.  As such, I find that the good

faith exception to the exclusionary rule, as expressed in *Davis*, does not apply to these facts.

2. **Reasonable Suspicion**

Nevertheless, I find no suppression is warranted here. In light of *Marquez*, I agree with the Magistrate Judge's conclusion that the search was not unreasonable because it was supported by reasonable suspicion.

As the Magistrate Judge correctly noted, the Court in *Jones* expressly declined to reach the issue of whether a warrant is required for installation of a GPS tracking device, or if not, the degree of suspicion necessary. *Jones*, 132 S. Ct. at 954 (holding that the Court had no occasion to consider the government's alternative argument that "the attachment and use of the devise was reasonable--and thus lawful--under the Fourth Amendment, because the 'officers had reasonable suspicion, and indeed probable cause, to believe that [Jones] was a leader in a large-scale cocaine distribution conspiracy'"). Whether a search is "reasonable" under the circumstances, is determined by assessing "the degree to which it intrudes upon an individual's privacy . . . and the degree to which it is needed for the promotion of legitimate governmental interests." *Sampson v. California*, 547 U.S. 843, 848 (2006) (citation omitted).

In *Marquez*, the Eighth Circuit addressed this precise legal issue, and held that a warrant is not required to install a non-invasive GPS tracking device on a suspect's vehicle for a reasonable period of time, when it is installed while the vehicle is parked in a public place, and the officers have reasonable suspicion that the vehicle is involved in criminal activity. *Marquez*, 605 F.3d at 610. I agree that the Magistrate Judge's

Appellate Case: 13-3253   Page: 82   Date Filed: 02/12/2014 Entry ID: 4123547

conclusion that *Marquez* was not abrogated by *Jones*, and as such remains binding law in this Circuit.

*Marquez* is on all-fours with the instant case. There, like here, the device was non-invasive and did not interfere with the operation of the vehicle. It was installed while the vehicle was in a public place, and could not be monitored while inside a structure, and only monitored the vehicle when it was in a public space. It appears that the monitoring in *Marquez* occurred for a period at least as long as the monitoring in this case. Finally, the agents here had reasonable suspicion that Robinson was engaged in criminal activity, that he used his vehicle to engaged in that activity, and that the vehicle would provide evidence of that criminal activity.

Defendant and the ACLU argue that *Marquez* was effectively abrogated by *Jones*. The ACLU further asserts that the Eighth Circuit "never purported to rule directly on the question now before this Court" because in reliance on pre-*Jones* case law, the Court held that no search had occurred. I do not agree with either of these contentions. As set forth above, the Court in *Jones* expressly declined to address whether such a search would be reasonable without a warrant if supported by reasonable suspicion, and as such did not abrogate *Marquez*. The ACLU's further contention is refuted by the language of the *Marquez* opinion. The ACLU itself notes that "'the overarching requirement of reasonableness does not come into play unless there is a search . . . within the meaning of the Fourth Amendment.'" (Doc. No. 103, at 7) (quoting *Garcia*, 474 F.3d at 996). If, as the ACLU asserts, the Eighth Circuit opinion depended wholly upon the determination that no "search" had occurred, there would be no need to address the reasonableness of

Appellate Case: 13-3253   Page: 83   Date Filed: 02/12/2014 Entry ID: 4123547

the search. But the Eighth Circuit did discuss whether the officers had reasonable

suspicion and the reasonableness of the search, in some detail.

Nor am I persuaded by the ACLU's reference to the Seventh and Ninth Circuit

decisions vacated and remanded by the Court in light of *Jones*: *United States v. Cuevas-*

*Perez*, 640 F.3d 272, 286 (7th Cir. 2011)*, cert. granted, vacated & remanded* 132 S. Ct.

1534 (2012), and *United States v. Pineda-Moreno*, 591 F.3d 1212 (9th Cir. 2010)*, cert.*

*granted, vacated & remanded* 132 S. Ct. 1533 (2012). The ACLU asserts that these two

decisions, vacated in light of *Jones*, "reached nearly identical conclusions to *Marquez*."

But the ACLU is incorrect, as it is clear that neither of these cases involved a

finding of reasonable suspicion. The main opinion in *Cuevas-Perez* never mentions

reasonable suspicion, and the concurring opinion makes plain that the Court was not

reaching that issue. *See Cuevas-Perez*, 640 F.3d at 285 ("Nor do I find it necessary to ask

whether a reasonable suspicion standard would accommodate the competing

constitutional interests at play. *Cf. Karo*, 468 U.S. at 718 n. 5, 104 S.Ct. 3296 (intimating

that reasonable suspicion might be sufficient to allow monitoring of a beeper in the

home).") The dissent confirms this assessment, noting that the majority took the position

that there is no "search" in *any* case where the government attaches even the most

sophisticated GPS to a vehicle in public, and then tracks its every movement, whether the

car is on a public road or parked in a private garage. The dissent acknowledged that "the

majority does not apply any Fourth Amendment screen at all--not a 'reasonable

suspicion' rule, by comparison to *Terri v. Ohio* . . . and not the normal 'probable cause'

rule." *Id.* at 287.

Appellate Case: 13-3253   Page: 84   Date Filed: 02/12/2014 Entry ID: 4123547

In *Pineda-Moreno*, the Ninth Circuit likewise held that neither installation of a GPS device on the undercarriage of the defendant's car, nor monitoring of that device, constituted a "search" under the Fourth Amendment, even though two of the installations occurred while the car was parked in the defendant's driveway, a few feet from the side of his trailer. Here, too, the appellate court based its decision on the determination that the defendant had no reasonable expectation of privacy in the undercarriage of his car, and that use of the tracking device was not a search. Like the Court in *Jones*, the appellate court specifically declined to reach the issue of reasonable suspicion. "Because we conclude that the agents did not 'search' Pineda-Moreno's car, we do not comment on the district court's conclusion that the agents had reasonable suspicion that he was engaged in criminal activity." *Pineda-Moreno*, 591 F.3d 1217 n.3.

It may well be that in a future opinion the Eighth Circuit will modify its approach to the issue in light of *Jones*, but until such time, *Marquez* remains good law. As the material facts related to the GPS in *Marquez* are indistinguishable from the facts in this case, and both cases involve a finding of reasonable suspicion, the Eighth Circuit's opinion in *Marquez* requires a denial of Defendant's motion to suppress.

### 3. **Other Grounds**

For the reasons stated by the Magistrate Judge in the Second R&R, I also reject Defendant's argument that the installation of the GPS was a "seizure" under the Fourth Amendment and his further argument that suppression is required under the First Amendment.

Appellate Case: 13-3253   Page: 85   Date Filed: 02/12/2014 Entry ID: 4123547

Accordingly,

**IT IS HEREBY ORDERED** that the Second Pretrial Order and Recommendation of the United States Magistrate Judge [Doc. No. 83] is **SUSTAINED and ADOPTED**, except as stated above.

**IT IS FURTHER ORDERED** that Defendant's Objections to the Second Pretrial Order and Recommendation of the United States Magistrate Judge are **OVERRULED**, except as stated herein on one ground.

**IT IS FURTHER ORDERED** that Defendant's Motions to Dismiss [Doc. Nos. 25, 52, and 66] are **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motions to Sever [Doc. Nos. 26 and 78] are **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motions to Suppress Evidence [Doc. Nos. 27 and 67] are **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Change of Venue [Doc. No. 68] is **DENIED without prejudice**.


AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 15th day of October, 2012.

84

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. S3-4:11CR00361 AGF (DDN) |
| | ) | |
| FRED W. ROBINSON, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

This matter is before the Court on the pretrial motions of Defendant Fred W.
Robinson, filed in response to the third superseding indictment. The charges are more
fully summarized in the Magistrate Judge's Second Pretrial Order and Recommendation
("Second R&R"; Doc. No. 83), and in this Court's prior Order of October 15, 2012 (Doc.
No. 148), and will be only briefly summarized here.

Defendant is charged with eight counts of wire fraud and federal program theft.
Counts 1-3 relate to Defendant's alleged conduct as Chairman of the Board of Trustees of
the Paideia Academy ("Paideia"), a tuition-free Missouri Charter School for grades K-8,
sponsored by the Missouri University of Science and Technology, until its charter was
cancelled in 2010. Paideia was funded by substantial federal education funds and
Missouri education funds intended for legitimate school operations. The indictment
alleges that beginning on or about April 1, 2009, and continuing through at least
November 10, 2010, Defendant devised a scheme to defraud and to obtain money from
the State of Missouri and the United States by means of false pretenses. Defendant

85

allegedly used the funds in connection with construction, renovation, and rehabilitation of a building for a day care facility to be owned and operated by Defendant.  Count 1 asserts a claim of wire fraud, related to the fax transmission of an invoice from Paideia related to the construction and rehabilitation.  Counts 2 and 3 assert charges of federal program theft, in violation of 18 U.S.C. § 666(a)(1)(A), for the periods from May 1, 2009 to April 30, 2010, and May 10, 2010 to April 30, 2011, respectively, related to the diversion of funds from Paideia for the construction and development of the child care facility to be operated by Defendant.

Counts 4-8 assert charges of federal program theft related to Defendant's employment with the City of St. Louis. The indictment charges that in each of the years 2006 to 2010, Defendant was an agent of a "local government," namely the City of St. Louis, and that the City received in excess of $10,000 in grants from the United States Department of Housing and Urban Development ("HUD").  It further charges that in each of these years, Defendant embezzled, stole, or fraudulently obtained funds of at least $5,000 owned or under the custody or control of the City of St. Louis, by submitting false weekly time sheets falsely certifying hours worked, and that the City of St. Louis paid the amount of $35,360 in each year based on the false time sheets, in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2.

## Relevant Procedural History

This matter is now before the Court for a ruling on pretrial motions for the third time.  Defendant filed various motions in response to the initial indictment, including a motion to suppress GPS evidence, which motions were referred to Magistrate Judge

2

86

David D. Noce. After the Magistrate Judge issued his first Report and Recommendations ("First R&R"; Doc. No. 36), the Supreme Court issued its Opinion in *United States v. Jones*, 132 S. Ct. 945 (2012), holding that the attachment of a GPS to a vehicle while on the public roadway constitutes a search within the meaning of the Fourth Amendment. I therefore directed the parties to file supplemental briefs addressing the impact of *Jones*, and the trial setting was continued briefly to allow briefing and oral argument.

Defendant filed objections to the First R&R, but also filed a new motion to dismiss asserting that subject matter jurisdiction was lacking. In light of Defendant's new motion, the matter was re-referred to the Magistrate Judge for further proceedings, including a reconsideration of the recommendation on the motion to suppress in light of *Jones*.

While the matter was before the Magistrate Judge, the first superseding indictment was filed, which altered the allegations supporting Counts 4-8 of the indictment. The Magistrate Judge issued a new pretrial order, and Defendant filed a new round of pretrial motions, some of which differed from the previously-filed motions. After further pretrial proceedings, including a second evidentiary hearing, the Magistrate Judge issued the Second R&R (Doc. No. 83), which replaced, in its entirety, the First R&R. In the Second R&R, the Magistrate Judge recommended the denial of Defendant's various motions. With respect to the motion to suppress the GPS evidence, the Magistrate Judge found that suppression was not required for two reasons: (1) at the time the GPS was installed, the law of the land was that no warrant was required, and the good faith exception applied,

Appellate Case: 13-3253   Page: 89   Date Filed: 02/12/2014 Entry ID: 4123547

and (2) under Eighth Circuit law, no warrant was required because the search was supported by reasonable suspicion.

While the parties were briefing the objections to the Second R&R, the ACLU requested leave to file an *amicus curiae* brief related to the motion to suppress, which I allowed. On motion of Defendant, I heard argument on Defendant's motions and objections to the Second R&R on August 31, 2012. Before I issued a ruling on the objections to the Second R&R and Defendant's various motions, the grand jury returned a second superseding indictment, changing yet again the allegations of Counts 4-8. Defendant represented that the changes to the indictment did not require further briefing, and requested that the previously-filed motions be deemed to apply to the new indictment. The jury trial was rescheduled for October 17, 2012, and I issued my Order on the Second R&R, substantially denying Defendant's motions. In the Order, I adopted the Second R&R in all respects, with the exception of one of two grounds asserted for denying Defendant's motion to suppress the GPS evidence. I adopted the portion of the Second R&R finding that no warrant was required under *United States v. Marquez*, 605 F.3d 604 (8th Cir. 2010), as the agents had reasonable suspicion to believe the target was involved in criminal activity. But I did not adopt the finding that the good faith exception applied under *Davis v. United States*, 131 S. Ct. 2419, 2423-24 (2011) .

Days before the trial was scheduled to commence, and following the final pretrial conference, the United States advised that based on new information it had received, it was seeking to supersede Counts 4-8 of the indictment yet again. With consent of Defendant, the trial date was continued for two days, during which time Defendant would

4

Appellate Case: 13-3253   Page: 90   Date Filed: 02/12/2014 Entry ID: 4123547

evaluate whether he wished to file new motions. After review of the third superseding indictment, Defendant advised that he wished to have further pretrial proceedings, including the opportunity to update the previously filed motion to dismiss, thereby necessitating yet another continuance of the trial setting.[1]

Following the arraignment on the third superseding indictment, Defendant filed eight motions, including discovery motions, a motion for a bill of particulars, and various motions to dismiss, which are the matters currently before me. Defendant's motions both re-assert previously argued grounds and assert new grounds. The United States responded to the motions, and a hearing was held on November 14, 2012. The trial scheduled for December 3, 2012 was thereafter continued on motion of Defendant.

**The Superseding Indictments**

Because the changes are pertinent to at least one of Defendant's motions, I will briefly summarize the various changes to the indictment.

On September 8, 2011, the grand jury returned the initial indictment charging Defendant with one count of wire fraud, in violation of 18 U.S.C. § 1343, and two counts of federal program theft, in violation of 18 U.S.C. § 666, related to an alleged scheme involving the operation and funds of Paideia Academy; and five counts of federal program theft related to Defendant's employment with the St. Louis Treasurer's Office. Counts 4-8 asserted that Defendant was an employee of the Treasurer's Office for the City of St. Louis, an organization that received the requisite amount of federal funds

─────────────────

[1] Solely to minimize the delay in the trial setting, I elected not to refer any new pretrial motions to the Magistrate Judge for further report and recommendation.

through contracts with the United States District Court and the United States Bankruptcy Court, and that Defendant had embezzled, stole, or obtained by fraud, funds under the custody or control of the Treasurer's Office for the City of St. Louis.

In the first superseding indictment, filed on February 23, 2012, Defendant was again charged with one count of wire fraud (Count 1), and two counts of federal program theft (Counts 2 and 3) related to the funds of Paideia Academy. Counts 4-8 again charged Defendant with federal program theft, but asserted that Defendant was an "agent" of an organization, namely, the City of St. Louis, as an employee of the Treasurer's Office, and with respect to the federal funds, alleged that the organization received the requisite federal funds through grants from the United States Department of Housing and Urban Development.

In the second superseding indictment, filed on October 3, 2012, Count 1 was changed to allege a slightly earlier ending date for the scheme to defraud, and the amount of Paideia funds disbursed for allegedly improper purposes was increased slightly. Counts 4-8, which previously alleged that Defendant was an agent of "an organization" (namely the City of St. Louis as an employee of the Treasurer's Office), was changed to allege that Defendant was an agent of "a local government" (again, the City of St. Louis as an employee of the Treasurer's Office).

In the third superseding indictment (Doc. No. 167), filed on the eve of trial, Counts 4-8 of the indictment were amended to delete any reference to the particular office in which Defendant was employed, alleging only that Defendant was "an agent of a local government, that is, the City of St. Louis," and that the City received the requisite

6

90

federal funds in each year through grants from the United States Department of Housing and Urban Development.

### A. Motion to Dismiss Counts 4-8   [Doc. No. 177]

Defendant asserts that Counts 4-8 of the Indictment should be dismissed for lack of subject matter jurisdiction.  Defendant argues that § 666 was intended to address agencies with responsibility to administer federal funds, and that neither the Parking Division of the Treasurer's Office nor Defendant had any authority to do that.  Although it is not specified in the indictment, Defendant argues that there is no dispute that Defendant was an employee of the Parking Division, which division reports to the Treasurer of the City of St. Louis (an elected official), and that the federal funds were received by the City of St. Louis Department of Human Services, which reports to the Mayor.  Defendant contends that the Treasurer does not report to the Mayor, nor does the Mayor have authority over the Treasurer's office.  Further, neither the Parking Division nor the Treasurer's Office receives any federal funds, and Defendant's salary is paid from funds generated by the Parking Division.  As such, Defendant argues, he is not an "'agent' of any department of the city receiving federal funds."  Defendant further asserts that because the necessary nexus is lacking, the statute is unconstitutional as applied.

### 1. Subject Matter Jurisdiction

In connection with his jurisdictional argument, Defendant contends that as charged, subject matter jurisdiction requires that Defendant be an "agent" of the City of St. Louis, and that the City of St. Louis have received federal benefits of $10,000 or more in each of the relevant years.  Similar to the arguments in his prior motion to dismiss,

7

91

Defendant argues that Counts 4-8 must be dismissed because (i) Defendant was not an "agent" within the meaning of the statute, as he purportedly had no ability to "act on behalf of" the Parking Division, the City, or the Department of Human Services; (ii) the statute requires that there be an agency relationship between the defendant and the agency receiving the federal funds; and (iii) there must be a link between the federal funds and the agency in which the misconduct occurred, and that connection is lacking here.  I remain unpersuaded, and reject these arguments for the reasons stated in my prior Order and as further stated below.

The current indictment alleges that Defendant was an agent of a local government, namely the City of St. Louis, and that the City of St. Louis received more than the requisite statutory amount of federal funds in each of the years charged.  Offering facts outside the four corners of the indictment, Defendant, in various places, asserts that Defendant was an employee of the Parking Division, which is separate from the City of St. Louis, and that the federal funds were received by the Department of Human Services. Defendant contends that there is no relationship between the Department of Human Services, which is under the control of the Mayor, and the Parking Division, which is under the control of the Treasurer; that these entities have separate bank accounts and funding; and that the "only common element" is that they contract with the City Comptroller for payroll services.  The United States disputes these facts, and asserts that it will demonstrate at trial that Defendant is an employee of the City of St. Louis.

As set forth in my prior Order, Defendant's argument essentially relates to the sufficiency of the government's evidence.  At this stage, however, the allegations of the

Appellate Case: 13-3253   Page: 94   Date Filed: 02/12/2014 Entry ID: 4123547

indictment must be accepted as true. *United States v. Sampson*, 371 U.S. 75, 78-79 (1962). Although Defendant urges me to follow certain cases from the Second Circuit, the controlling Eighth Circuit law provides that challenges to the sufficiency of the evidence are not properly raised pretrial. *See United States v. Ferro*, 252 F.3d 964, 968 (8th Cir. 2001). As such, I decline to substitute my judgment, pretrial, for that of the jury following a full presentation of the evidence. For the same reason, and as stated in my previous Order, I reject Defendant's argument that the government cannot prove that Defendant was "authorized to act" on behalf of the City, the Treasurer's Office or the Parking Division. This, too, is a matter to be determined at trial.

I further find that the indictment properly alleges Defendant's agency under the terms of the statute. The indictment alleges that Defendant was an agent of the City of St. Louis, who was paid by the City, and that Defendant misapplied property and funds of the requisite amount owned by, and under the care, custody, and control of the City, by submitting false time sheets. Defendant argues that this is not sufficient because Defendant's employment "does not rise to an agency relationship" with the Parking Division, the City, or the Department of Human Services. Again, Defendant is asking this Court to resolve factual disputes, pretrial, based on what Defendant believes the evidence will show. Moreover, contrary to Defendant's contention, the statute does not require that the agent be able to bind the government entity with respect to the use of the funds. *See United States v. Keen*, 676 F.3d 981, 989-90 (11th Cir. 2012) (holding that the statute does not require that the defendant be authorized to act on behalf of the entity with respect to its funds). It requires only that the person be "authorized to act" on

9

93

behalf of the City.  As set forth in my prior Order, there is nothing to suggest that
Defendant had no *authority* to act on behalf of the City and its Parking Division.
Whether Defendant properly exercised that authority is a separate matter.

Further, the statute expressly provides in its definitional section that in the case of
a government, "agent" includes "a servant or employee."  18 U.S.C. § 666(d)(1).  Though
Defendant is alleged to have embezzled or obtained funds by fraud by filing false time
sheets and certifications of hours worked, there is no suggestion that he was not an
"employee."  In defining "agent" in his Supplemental Memorandum, Defendant cites
extensively to *Black's Law Dictionary*.  But there is no need to resort to *Black's Law
Dictionary* where, as here, Congress undertook expressly to define the term "agent," and
specified that in the case of a government, it shall include an employee.  *See Burgess v.
United States*, 553 U.S. 124, 129-30 (2008) (noting, "[s]tatutory definitions control the
meaning of statutory words . . . in the usual case") (internal citations and quotations
omitted).

The cases cited by Defendant in his Supplemental Memorandum do not suggest
otherwise.  Defendant cites *United States v. Phillips*, 219 F.3d 404, 414 (5th Cir. 2000),
and two cases that rely on *Phillips*, as cases that hold that a government employee is not
an agent for purposes of the statute.  But in *Phillips*, the Court made no such finding.
Rather, the Court found that the Tax Assessor (Phillips) was a wholly separate
government entity from the government entity of the parish (the entity
receiving/administering the federal food stamps), and determined that Phillips, "as a
matter of law, was not an employee or officer of the parish."  *Id.* at 413.  Here, the

10

94

government alleges and proffers that Defendant was an employee of the City of St. Louis, the same entity that received the federal funds.

Nor do I accept Defendant's contentions that there is (i) an insufficient agency relationship between Defendant and the agency receiving the federal funds or (ii) an insufficient link between the federal benefits received and the agency in which the misconduct occurred.  Again, the indictment alleges that Defendant was an employee of the City of St. Louis, and that the City was the recipient of the federal funds, identified as HUD grants.  The prosecution is entitled to present evidence of its case.

Even if the Court were inclined to examine evidence outside the allegations of the indictment, Defendant offers little to support his allegation that the Treasurer's Office and the Department of Human Services "have no common employees, no common bank accounts, no common mission and no common funding."  (Doc. No. 177, at 15.)  The United States has proffered that these offices in fact use common bank accounts, that Defendant was paid in the same manner as other City employees, and that he received benefits from the City of St. Louis, just like other City employees.  What is more, the very statute cited by Defendant demonstrates there is indeed common funding.  The statute specifically provides that a portion of the parking meter fund "shall at the end of each fiscal year then be transferred to the general fund of the city."  Mo. Rev. Stat. § 82.485.  As such, it is clear that the parking meters that Defendant was hired to patrol were expected to provide funding for the general revenue of the City of St. Louis.

Defendant further asserts that § 666 does not apply to lower levels of state and local bureaucracies, but rather is limited to "entities that receive a substantial amount of

11

95

federal funds and to agents who have the authority to effect significant transactions,"
citing *United States v. Westmoreland*, 841 F.2d 572, 578 (5th Cir. 1998).  But this
holding appears to be at odds with Eighth Circuit law, and no longer seems to be the law
in the Fifth Circuit.  In *United States v. Hines*, 541 F.3d 833, 836 (8th Cir. 2008), a case
Defendant does not address at all, the defendant was a deputy sheriff whose job was to
enforce eviction orders.  The defendant's conviction under § 666 was upheld and
jurisdiction was found based upon federal funds received by some other office of St.
Louis County.  Further, as the United States correctly notes, a more recent case from the
Fifth Circuit has rejected the approach in *Westmoreland*.  *See United States v. Ollison*,
555 F.3d 152 (5th Cir. 2009).  *Ollison* involved the conviction of a school district
secretary under § 666.  The Fifth Circuit noted that the plain language of the statute
defines "agent" to include "employee," and held that "[t]he statute itself does not
distinguish between 'high-level' and 'low-level' employees."  *Id*. at 160-61.  Other
appellate courts have agreed.  *See United States v. Sotomayor-Vasquez*, 249 F.3d 1, 10
(1st Cir. 2001) (recognizing that "§ 666 has been given a wide scope, to include all
employees 'from the lowest clerk to the highest administrator'").

And assuming it is true that the federal funds were signed for by the City's
Department of Human Services, it does not follow that Defendant must be an employee
with the Department of Human Services for jurisdiction to attach.  Nor is there any
requirement that the defendant's wrongful conduct actually impact the federal funds, as
*Phillips* and *United States v. Sunia*, 643 F. Supp. 2d 51 (D.D.C. 2009), cited by
Defendant, suggest.  The Eighth Circuit specifically rejected these arguments in *Hines*.

In *Hines*, the Court upheld the defendant's conviction notwithstanding Hines' arguments that "he was not entrusted with the disbursements of any money, federal or otherwise; his dealings were purely local and could not jeopardize in any significant manner the integrity of federal programs; and the federal monies given to St. Louis County did not reach his department." *Hines*, 541 F.3d at 836. The Court further held that "the plain language of the statute does not require, as an element to be proved beyond a reasonable doubt, a nexus between the activity that constitutes a violation and federal funds." *Id.* *See also United States v. Lipscomb*, 299 F.3d 303, 309 (5th Cir. 2002) (rejecting a narrow construction of § 666 that would limit its prohibition to activity "directly related to federal spending or federally funded programs," as such a construction would be contrary to the Court's "consistently broad interpretation of § 666 as targeting corruption *qua* corruption"); *United States v. Bravo-Fernandez*, 828 F. Supp. 2d 441, 455 (D.P.R. 2011).

As such, on this record, there is no basis to dismiss for lack of subject matter jurisdiction.

2.   Constitutionality As Applied

Defendant also contends that on these facts, 18 U.S.C. § 666(a)(1)(A) violates the Tenth Amendment and exceeds the scope of the Spending Clause, and is therefore unconstitutional as applied. Defendant asserts that application of the statute would disturb the proper balance between the state and federal governments, and would improperly intrude on areas reserved to the States. He bases this argument, in part, upon his contention that here there is no evident federal interest.

13

The Supreme Court has recognized that § 666 was enacted under the Necessary and Proper Clause, and that its validity under Congress's Article I power does not require "proof of connection with federal money as an element of the offense." *Sabri v. U.S.*, 541 U.S. 600, 605 (2004). "Instead, the Court stated that Congress's inclusion of jurisdictional amounts creates a sufficient nexus to constitute a valid enactment under the Necessary and Proper Clause." *Hines*, 541 F.3d at 836 (citing *Sabri*, 541 U.S. at 605-06).

Defendant's as applied challenge fails because it assumes that the federal interest here is limited to direct protection of the particular federal funds received. But that is not the approach Congress adopted. Rather, recognizing that funds are fungible, Congress focused on protecting the organizations electing to receive federal funding. As the Eleventh Circuit recently summarized in *Keen*:

> 18 U.S.C. § 666 was enacted "to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery." S. Rep. No. 98-225, at 370 (1983), 1984 U.S.C.C.A.N. 3182, 3511; *accord Sabri v. United States*, 541 U.S. 600, 606 [ ] (2004). According to the Supreme Court, to effectuate this purpose, Congress did not limit itself merely to going after corrupt individuals who abuse their positions to skim federal funds. In addition, Congress was committed to the even broader objective of ensuring "the integrity of organizations participating in federal assistance programs." *Fischer v. United States*, 529 U.S. 667, 678 [] (2000). The recognition of that ambitious objective, in turn, has led the Court repeatedly to reject statutory constructions aimed at narrowing § 666's scope, in favor of a broad reading.

676 F.3d at 990. Thus, the Court in *Keen* recognized that the fraudulent conduct of employees who are thieves and cheats "poses a threat to the integrity of the entity, which in turn poses a threat to the federal funds entrusted to that entity." *Id.* Similarly recognizing this broad scope, the Eighth Circuit, in *Hines,* noted that "[t]he Supreme Court upheld our interpretation of § 666 as Congress's attempt to preserve the integrity of

14

Appellate Case: 13-3253   Page: 100   Date Filed: 02/12/2014 Entry ID: 4123547

federal funds by lessening the burden of federal prosecutors to prove what may be an impossible-to-trace, but very real, impact of local corruption on federal funds."  541 F.3d at 836.

Hines is very much on point.  Like Defendant here, the defendant in Hines raised an as-applied challenge, asserting "that he was not entrusted with the disbursements of any money, federal or otherwise; his dealings were purely local and could not jeopardize in any significant manner the integrity of federal programs; and the federal monies given to St. Louis County did not reach his department." Id. at 836.  The Court recognized that the statute's "legitimate purpose and Congress's rational means of achieving it by eschewing a nexus requirement in the offense would be undermined if defendants such as Hines could require the government to establish such a nexus." Id.  The Eighth Circuit thus unequivocally rejected such an as-applied challenge, declining to "require any connection between federal funds and the activity that constitutes a violation of § 666." Id.

The "facts" here appear to be at least as strong as those in Hines.  Here, the state statute on which Defendant relies, related to the parking division, assumes that as much as forty percent of the increase in funds generated by the parking division, net of certain expenses, be paid over to the City's general revenue each year.  Inasmuch as the salaries of the parking division's employees are paid from this fund, the fraudulent receipt of salary, such as that alleged here, or other embezzlement from the fund, could easily diminish the amount of funds available to be paid to the City's general operating fund, thereby threatening the integrity of the City and its ability to carry out its projects,

Appellate Case: 13-3253   Page: 101   Date Filed: 02/12/2014 Entry ID: 4123547

including those projects receiving federal funding.  This is the very type of "harm" discussed in *Keen*.  And as the Court in *Hines* noted, "'where the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class.'" *Id.* (quoting *Gonzales v. Raich*, 545 U.S. 1, 3 (2005).  As such, on this record, the Court finds the statute is not unconstitutional as applied.

### B. Motion to Dismiss Counts 2 and 3 [Doc. No. 183]

The allegations related to Counts 2 and 3 are set forth more fully in my prior Order and in the Second R&R, and will therefore be recited only in summary here.  Counts 1-3 address Defendant's position as Chairman of the Board of Trustees of Paideia, which was a wholly-owned subsidiary of the Paideia Corporation, a nonprofit corporation.  Paideia was funded by substantial federal education funds and Missouri education funds intended for legitimate school operations.  Defendant maintained an office at Paideia's administrative office and was involved in the day-to-day operations.

Separate from Paideia, Defendant and a friend set up an LLC to operate a day care center to be called The Little People's Academy. The indictment alleges that beginning on or about April 1, 2009, and continuing through at least November 10, 2010, Defendant devised a scheme to defraud and to obtain money from the State of Missouri and the United States by means of false pretenses.  As part of the scheme, Defendant directed that a resolution be passed by the Paideia Board of Trustees approving a purported loan of Paideia funds to the day care to acquire and rehab a building for the day care's operation. In violation of Paideia's bylaws, however, Defendant failed to advise the Board of

16

100

Trustees of his financial interest in the transaction or that he was a co-owner of the company that was to operate the day care center.

In furtherance of the scheme, Defendant directed and authorized the purchase of the day care building using Paideia funds, in the amount of $22,333, which consisted of Federal and Missouri education funds. Defendant thereafter directed and authorized the payment of approximately $159,700 of Paideia funds, again consisting of Federal and Missouri education funds, for the construction, renovation, and rehabilitation of the building, for the purpose of developing the day care.

In June, 2010, the Missouri Department of Education determined not to approve Paideia's application for a continuing charter to operate its K-8 campuses. After it lost its charter, Defendant opened a bank account in the name of Paideia Corporation, West Florissant Capital Improvement, and continued to authorize the transfer of hundreds of thousands of dollars of Paideia's funds to the account and for the renovation of the building. The use of Paideia's Federal and Missouri education funds for the purchase, construction, and rehabilitation of the day care building was never disclosed to or authorized by the United States Department of Education, the Missouri Department of Elementary and Secondary Education, or the Missouri University of Science and Technology.

Counts 2 and 3 assert charges of federal program theft, in violation of 18 U.S.C. § 666(a)(1)(A), for the periods from May 1, 2009 to April 30, 2010, and May 1, 2010 to April 30, 2011, respectively, related to the diversion of funds from Paideia for the construction and development of the child care facility to be operated by Defendant.

Appellate Case: 13-3253   Page: 103   Date Filed: 02/12/2014 Entry ID: 4123547

Defendant contends § 666 is unconstitutional as applied because the offense conduct alleged "does not threaten either the integrity or proper operation of a federal program." (Doc. No. 183, at 3.) Defendant bases this assertion on his assumption that the federal government typically provides funds to charter schools "in the form of reimbursement only *after* the schools provide documentation proving that the funds were expended for permissible purposes and in keeping with federal guidelines." (*Id.* at 4.) Thus, here too, Defendant asserts that there is not a sufficient "connection between the offense and the expenditure of federal funds." *Id.*

In this motion, Defendant is asserting essentially the same arguments and grounds as he raised with respect to Counts 4-8. And the Court denies the motion for the same reasons stated above. As discussed above, the Eighth Circuit made plain in *Hines* that the prosecution is not required to demonstrate that the agent's embezzlement or fraudulent conduct had a direct impact on the federal funds. Thus, the fact that payments had been expended to reimburse costs incurred by Paideia is not what is at issue. What is important is that Defendant's alleged fraudulent conduct threatened the integrity of the institution receiving the funds, namely Paideia, and thereby threatened the program for which the funds had been expended. As the Eighth and Eleventh Circuits discussed in *Hines* and *Keen*, application of the statute in this context is a proper exercise of Congress's power under the Spending Clause, and does not violate the prerogatives of the States under the Tenth Amendment.

102

Appellate Case: 13-3253   Page: 104   Date Filed: 02/12/2014 Entry ID: 4123547

**C. Motion for Bill of Particulars**   [Doc. No. 178]

Defendant has also filed a motion for a bill of particulars, specifically requesting (1) the source of federal funds to Paideia Academy from May 1, 2009 to April 30, 2010 and documentation; (2) the source of federal funds to Paideia Academy from May 1, 2010 to April 30, 2011 and documentation; (3) the actual recipient of the HUD grant and documentation; and (4) the agency relationship between the defendant and the City of St. Louis and documentation.  The United States responds that each of the counts of the superseding indictment contain the elements of the offense charged, and fairly inform Defendant of the charge against which he must defend.  The United States further asserts that it has provided more than sufficient discovery to advise Defendant fairly of the details of the charges.

The determination of whether to grant a bill of particulars is committed to the sound discretion of the court.  *United States v. Sileven*, 985 F.2d 962, 966 (8th Cir. 1993).  The primary purpose of a bill of particulars is to apprise the defendant of the nature of the charges against him and to prevent or minimize the element of surprise at trial.  *United States v. Wessels*, 12 F.3d 746, 750 (8th Cir. 1993).  "'A bill of particulars serves to inform the defendant of the nature of the charge against him with sufficient precision to enable him to prepare for trial, to avoid or minimize the danger of surprise at trial. . . .'"  *United States v. Bowie*, 618 F.3d 802, 817 (8th Cir. 2010) (quoting *United States v. Hernandez*, 299 F.3d 984, 989–90 (8th Cir. 2002).  The purpose of a bill of particulars is not discovery or to provide detailed disclosure of the government's evidence at trial.  *Wessels*, 12 F.3d at 750; *United States v. Matlock*, 675 F.2d 981, 986 (8th Cir.

19

103

1982) (same); *United States v. Hill*, 589 F.2d 1344, 1352 (8th Cir. 1979).   Nothing

entitles a defendant to a list of all details related to the charges. *See United States v.*

*Long*, 449 F.2d 288, 294-95 (8th Cir. 1971) (holding that effort by defendants to establish

exact times of act through bill of particulars, in order to establish alibis, was properly

denied).

Under this standard, it is clear that Defendant's motion is not well taken.  As

detailed in the Government's Response, the United States has provided extensive

discovery regarding the federal funds received by Paideia, including summary charts.

And, as the United States notes, in light of Defendant's position as Chairman of the

Board of Trustees, he was privy to information regarding Paideia's receipt of the federal

funds, as well as Paideia's bank records.  The United States also provided full discovery

regarding the HUD grant to the City of St. Louis and Defendant's employment records,

the latter of which, of course, Defendant also had access to.  The allegations of the

superseding indictment, coupled with this discovery, are more than sufficient to allow

Defendant fully to prepare his defense. *See United States v. Chen*, 378 F.3d 151, 162-63

(2d Cir. 2004).

In addition, the Court notes that Defendant has filed multiple rounds of motions

and had multiple hearings related to the very aspects of the charges he now raises, during

which Defendant has received extensive information regarding both the evidence and the

prosecution theory.  In light of the above, Defendant's assertion that the information is

necessary properly to defend against the charges and avoid surprise appears disingenuous,

and his motion for a bill of particulars shall be denied.

Appellate Case: 13-3253    Page: 106    Date Filed: 02/12/2014 Entry ID: 4123547

**D. Motion to Sever** [Doc. No. 181]

Defendant has reasserted his motion to sever, contending that joinder of Counts 1-3, related to the alleged fraud and theft involving Paideia Academy, with Counts 4-8, related to the alleged fraud and theft involving the City of St. Louis, is improper, and also that the prejudice to Defendant from a joint trial of the offenses requires severance under Rule 14, Fed. R. Cr. P. The Magistrate Judge already fully addressed this motion in his Second R&R, and I further addressed Defendant's arguments in my prior Order.

Defendant's current motion does not add anything material to the arguments previously made. While Defendant cites to *United States v. Reaves*, 2009 WL 3643476 (D. Neb. 2009), that case is distinguishable. *Reaves* involved joinder of counts related to a bank robbery with counts related to an armored car robbery that occurred four months later. This case presents similar types of fraud, some of which occurred during an overlapping time period. Evidence of Defendant's activities with Paideia are also intertwined with and relevant to the City of St. Louis charges. Finally, evidence of the fraudulent conduct related to Paideia and the City of St. Louis would likely be admissible under 404(b) of the Federal Rules of Evidence, or other grounds, were each tried separately. As such, the motion to sever is denied for these reasons and for the further reasons set forth in my prior Order.

**E. Motion for Change of Venue** [Doc. No. 180]

Defendant has moved for a change of venue pursuant to Rule 21(a), Fed. R. Crim. P., based on news stories which he asserts create prejudice against him and make it unlikely that he can receive a fair trial in this district. Here, too, Defendant's arguments

Appellate Case: 13-3253    Page: 107    Date Filed: 02/12/2014 Entry ID: 4123547

were fully addressed by the Magistrate Judge in the Second R&R, which I adopted.

Defendant has supplemented his motion with a few later-issued news articles (Doc. No.

214), but these do not serve to change the analysis.  None are inflammatory, and most

mention Defendant only in passing.  As stated in my prior Order, I have examined the

record and find that the pretrial publicity in this case has not been at all extensive, and

that the news articles submitted were objective and were not inflammatory.  Thus,

Defendant has not shown that a change of venue is warranted based on pretrial publicity

in this case.  *See United States v. Nelson*, 347 F.3d 701, 707-08 (8th Cir. 2003).  The

matter can be reexamined at a later stage should the voir dire examination suggest such

prejudice does, in fact, exist.

   **F. Motion to Suppress GPS Evidence** [Doc. No. 179]

   1. This Court's Prior Orders

   As summarized in the Relevant Procedural History above, Defendant has filed

several motions seeking to suppress the GPS evidence, asserting that a warrant was

required for installation under *Jones*.  In the Second R&R, the Magistrate Judge provided

a detailed and thorough recitation of the facts related to the motion to dismiss, and as

such I will not repeat those facts here.  Based upon my *de novo* review of the evidence

presented at the evidentiary hearings on December 1, 2011, and April 12, 2012, and the

filings and arguments asserted by the parties at the hearings before me, I again find the

factual findings in the Second R&R to be accurate, and I adopt them in their entirety.

   As detailed more fully in both my prior Order and in the Second R&R, the agents

in this case installed and completed the GPS tracking prior to the Supreme Court's

Appellate Case: 13-3253   Page: 108   Date Filed: 02/12/2014 Entry ID: 4123547

decision in *Jones*. Although the agents did not obtain a warrant for the installation of the GPS, and testified that they did not believe a warrant was required in light of the then-current case law. I found, as did the Magistrate Judge, that by January 21, 2010, prior to installing the GPS tracking device, the agents had reasonable suspicion that Defendant was engaged in fraudulent conduct, including federal program theft, with respect to the receipt of salary payments from the Treasurer's Office of the City of St. Louis.

As noted above, in the Second R&R, the Magistrate Judge denied the motion to suppress on two grounds. First, he determined that controlling law of the land at the time the device was installed and used was that no warrant was required to install a GPS tracker of this type while the vehicle was on public streets or to monitor the information that tracked the vehicle while in public view. The Magistrate Judge found that the Supreme Court decisions in *United States v. Knotts*, 460 U.S. 276, 281 (1983), and *United States v. Karo*, 468 U.S. 705, 715 (1984), and decisions from other circuits, provided controlling authority within the meaning of *Davis v. United States*, 131 S. Ct. 2419, 2423-24 (2011) (holding that "searches conducted in objectively reasonable reliance on binding appellate precedent [that is later overruled] are not subject to the exclusionary rule"). He notes that this determination was confirmed by the later Eighth Circuit opinion in *Marquez*. The Magistrate Judge found that the agents' conduct was in strict compliance with that authority, and therefore suppression was not appropriate under *Davis*. The Magistrate Judge also recommended that as the agents had reasonable suspicion, no warrant was required under *Marquez*.

Appellate Case: 13-3253   Page: 109   Date Filed: 02/12/2014 Entry ID: 4123547

Defendant objected to both of the conclusions of the Magistrate Judge. After allowing further briefing and argument, including the filing of an *amicus brief* by the ACLU, I overruled Defendant's objections on the second ground. I found that the holding in *Marquez* – that no warrant is required for installation of a GPS tracker under circumstances such as these, where the agents have reasonable suspicion – was still good law and was controlling on this Court.

With respect to the first ground, however, I did not adopt the conclusion in the Second R&R. As detailed in my prior Order, I found that *Knotts* and *Karo* were not controlling on these facts. I noted that prior to the installation of the GPS device on Defendant's car, the Seventh and the Ninth Circuits had both issued opinions holding that the warrantless installation and use of a GPS tracking device on a suspect's vehicle did not violate the Fourth Amendment, and no Circuit had held otherwise. The Eighth Circuit, however, had not ruled on the issue prior to the installation on Defendant's car.

Following the decision in *Jones*, courts in the Seventh and Ninth Circuits applied *Davis* to hold that the exclusionary rule should not apply to suppress evidence obtained in conformity with the *Garcia* and *Pineda-Moreno* cases. *See*, e.g., *United States v. Shelburne*, No. 3:11-cr-156-S, 2012 WL 2344457, at *5-6 (W.D. Ky. June 20, 2012) (applying Seventh Circuit precedent, as acts occurred in Indiana); *United States v. Aquilar*, No. 4:11-cr-298-BLW, 2012 WL 1600276, at *2 (D. Idaho May 7, 2012); *United States v. Nwobi*, No. CR10-952(C) GHK-7, 2012 WL 769746, at *3 (C.D. Cal. Mar. 7, 2012). Likewise, district courts in Minnesota and the Northern District of Iowa had no trouble determining that the good faith exception applied to avoid the suppression

24

108

of evidence obtained from installation of a GPS device after *Marquez*, but before *Jones*.

See *United States v. Barraza-Maldonado*, 879 F. Supp. 2d 1022, 1029-31 (D. Minn.

2012); *United States v. Amaya*, 853 F. Supp. 2d 818, 830-31 (N.D. Iowa 2012), *partially*

*withdrawn on other grounds*, No. CR11-4065-MWB, 2012 WL 1523045 (N.D. Iowa May

1, 2012).

The question before me was whether the *Davis* good faith exception applied

where, as here, no Eighth Circuit case law *expressly* authorized the warrantless

installation of a GPS tracker.

At the time I issued my Order, several other district courts had grappled with the

issue of whether non-binding precedent from other circuits could serve as the basis for

application of the good faith exception.  The cases (which are detailed in my prior Order)

came down on both sides. *See United States v. Ford*, No. 1:11-CR-42, 2012 WL

5366049, at *10 (E.D. Tenn. Oct. 30, 2012) (collecting cases).  Although at least three

district courts held that the *Davis* good faith exception applied based on the general state

of the law, including appellate cases from other Circuits, I read *Davis* more narrowly than

those district courts.  Based primarily on the language of the opinion in *Davis*, I agreed

with the cases that found that the holding in *Davis* extends only to "binding Circuit"

precedent. *See, e.g., Davis*, at 2428-29 (the majority noting that "the officers' conduct

was in strict compliance with then-binding Circuit law").  I further found this narrow

extension of the good faith exception to be consistent with the *Davis* majority's

discussion of the *Leon* good faith exception.

Based on this narrow reading of *Davis*, and in the absence of Eighth Circuit precedent expressly authorizing their conduct, I did not uphold the search under the good faith exception, even though I found the agents' conduct here strictly complied with the conduct authorized by these three cases.

2. Defendant's Current Motion to Suppress

Defendant has renewed his motion to suppress the GPS evidence, essentially reiterating the arguments made previously. Mischaracterizing what I held in my previous Order,[2] Defendant again argues that the Supreme Court case law at the time the GPS was installed did not hold that there was no expectation of privacy under these circumstances. Defendant also contends that the agents did not have reasonable suspicion at the time the GPS was installed, arguing that the agents "merely had a hunch that criminal activity may be afoot." (Doc. No. 174, at 2.)

Since I issued my prior Order on October 15, 2012, at least four district courts have addressed whether the *Davis* good faith exception applies where there is no binding Circuit precedent expressly authorizing installation of a GPS tracker. *See United States v. Fisher*, Nos. 2:10-cr-28 and 2:10-cr-32, 2013 WL 214379 (W.D. Mich. Jan. 18, 2013); *United States v. Guyton*, No. 11-271, 2013 WL 55837 (E.D. La. Jan. 3, 2013); *United States v. Figueroa-Cruz*, No. CR 11-S-424-S, 2012 WL 6186088 (N.D. Ala. Dec. 11, 2012); *Ford*, 2012 WL 5366049. All four sided with the line of cases holding that the

---

[2] Curiously, Defendant asserts in his motion: "This Court looked to two main Supreme Court cases to find that basically there was no expectation of privacy in the present case." (Doc. No. 179, at 4.) Although the Magistrate Judge made such a finding, clearly, as detailed above, I did not so hold.

26

good faith exception may apply based on reasonable reliance by the agents on non-binding Circuit precedent.

     These four recent opinions note that prior to *Jones*, courts of appeal in circuits other than their own (including, by then, the Eighth Circuit in *Marquez*) had found that a GPS tracking device installed on an automobile while it was on public streets did not constitute a Fourth Amendment search. Consequently, investigator reliance upon then-existing law in other circuits was reasonable. These courts emphasize in their reasoning that the purpose of the exclusionary rule – to prevent police misconduct – would not be served by excluding GPS evidence where there is no police culpability. *See Fisher*, 2013 WL 214379, at *2; *Guyton*, 2013 WL 55837, at *3-6; *Figeroa-Cruz*, 2012 WL 6186088, at *13-14; *Ford*, 2012 WL 5366049, at *10-11.[3]

     This more recent case law could support a reconsideration of my prior ruling with respect to the good faith exception, as the agents here acted in strict compliance with the non-binding precedent, and reasonably believed that their conduct was lawful. I decline to do so, however, for two reasons. First, no party requested that I reconsider my ruling based on this more recent case law. Second, it is unnecessary for me to do so, as I confirm my prior ruling that the search was not unreasonable because it was amply supported by reasonable suspicion.

---

    [3] In addition, the Fifth Circuit, in *United States v. Andres*, 703 F.3d 828 (5th Cir. 2013) recently held that it was "objectively reasonable for agents operating within the Fifth Circuit to believe that warrantless GPS tracking was permissible under circuit precedent," despite the absence of GPS-related precedent. *Id.* at 835. I note, however, that at the time the agents installed the GPS in *Andres*, there was Fifth Circuit precedent authorizing warrantless beeper installation on a vehicle in a public place. *See United States v. Michael*, 645 F.2d 252, 257 (5th Cir. 1981).

As stated above, in his most recent motion Defendant contends that the agents did not, in fact, have reasonable suspicion prior to installing the GPS tracker on his vehicle. I am not persuaded, however. Based on my *de novo* review of the entire record, I again adopt the findings of the Magistrate Judge in the Second R&R, and find that at the time the GPS was installed and monitored, the agents had more than ample reasonable suspicion that Defendant was engaged in criminal conduct and that tracking of his vehicle would provide further evidence of that conduct.

As discussed in my prior Order and in the Second R&R, the Court in *Jones* expressly declined to reach the issue of whether a warrant is required for installation of a GPS tracking device, or if not, the degree of suspicion necessary. *Jones*, 132 S. Ct. at 954 (holding that the Court had no occasion to consider the government's alternative argument that "the attachment and use of the device . . . was reasonable--and thus lawful--under the Fourth Amendment because 'officers had reasonable suspicion, and indeed probable cause, to believe that [Jones] was a leader in a large-scale cocaine distribution conspiracy'"). Whether a search is "reasonable" under the circumstances, is determined by assessing "the degree to which it intrudes upon an individual's privacy and . . . the degree to which it is needed for the promotion of legitimate governmental interests." *Samson v. California*, 547 U.S. 843, 848 (2006) (citation omitted).

In *Marquez*, which was decided prior to *Jones*, the Eighth Circuit addressed this precise legal issue, and held that a warrant is not required to install a non-invasive GPS tracking device on a suspect's vehicle for a reasonable period of time, when it is installed while the vehicle is parked in a public place, and the officers have reasonable suspicion

Appellate Case: 13-3253   Page: 114   Date Filed: 02/12/2014 Entry ID: 4123547

that the vehicle is involved in criminal activity. *Marquez*, 605 F.3d at 610. In my prior Order I held that *Marquez* was not abrogated by *Jones*, and I have found no recent case law suggesting otherwise. As such, *Marquez*, which is on all-fours with the instant case, remains binding law in this Circuit.

For the above reasons and the reasons set forth in my prior Order, I find that the GPS evidence obtained by the agents should not be suppressed.

### G. Defendant's Amended *Jencks* Motion [Doc. 187]

Defendant has requested that I examine *Jencks* materials that have been redacted by the prosecution, and suggests that Defendant must be given un-redacted copies. The prosecutor has represented that the matters redacted are unrelated to the testimony to be offered, and that no *Brady*[4] or *Giglio*[5] materials have been redacted. In response to Defendant's concern that some of the witnesses appear to have made statements that were internally inconsistent, the prosecutor has responded that any inconsistent statements were deemed to be *Brady* materials, and have been produced. Defendant further hypothesized that he might ask questions of the witnesses that are inconsistent with statements that are redacted on their summaries. The prosecutor noted that such an occurrence would be unlikely, as the redacted matters are not relevant to this case and would be outside the scope of direct testimony. But in the unlikely event such occurred, the prosecutor represented that he would agree, nonetheless, not to impeach such a witness based on any redacted material. Defendant now responds that the un-redacted

---

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).

[5] *Giglio v. U.S.*, 405 U.S. 150 (1972).

29

113

reports are necessary lest Defendant call a witness and elicit testimony inconsistent with a prior statement, thereby unknowingly eliciting perjured testimony.

The Jencks Act, 18 U.S.C. § 3500, only requires the government to disclose statements of a witness that relate to the subject matter of the witness's own trial testimony. *See United States v. Kamerud*, 326 F.3d 1008, 1015 (2003). Thus, it is entirely proper for the prosecutor to redact information that is not related to the subject matter of the trial testimony. I find Defendant's arguments for mandating production of un-redacted statements to be unconvincing, in light of the government's representations. Based on Defendant's request, I will review the redactions to determine that any redactions are, in fact, unrelated. Apart from that review, however, no further relief is appropriate.

**H. Defendant's Motion for Discovery** [Doc. No. 191][6]

Defendant has filed a discovery motion, requesting several categories of documents, seven of which remain in dispute.

In paragraph 2, Defendant requests documents regarding a witness named Ruckic, who apparently produced some records to Defendant (and perhaps also to the government) as a custodian of records, and who provided some cooperation as a cooperating witness before the subpoena requests. Defendant seeks a complete unredacted copy of her witness statement, a copy of her grand jury testimony, all reports relevant to any cooperation, and other documents. There is no indication that the government intends to call her as a witness, and at the hearing Defendant also stated that

---

[6] Defendant's motion was filed under seal.

Appellate Case: 13-3253   Page: 116   Date Filed: 02/12/2014 Entry ID: 4123547

he would not be calling her as a witness. The government states that it nonetheless produced a redacted copy of her interview reports because they believed they "fall within the Special Agent's Jencks materials." The government has produced a copy of any prior criminal history and of the "no target" letter, has disclosed that she received no benefit of any kind from the government, and has provided full details of any cooperation, including a copy of a recording made. The government has also stated that it has produced all documents required to be produced as *Brady* or *Giglio* material.

No further production regarding this individual will be required, as it appears that the United States has given Defendant all it is required to produce. Defendant's speculation that if one wears a wire it makes them a little suspicious is not enough to establish that the material constitutes *Brady* material, nor does it expand the government's obligations under Rule 16.

In paragraphs 3, 4 and 6, Defendant requests copies of un-redacted 302's and agent rough notes of interviews of all witnesses interviewed in relation to the case, the grand jury testimony of all witnesses who appeared in the proceeding, and the statements of all third parties who are not prospective witnesses in the case but who were interviewed in relation to the case. These requests are denied as beyond the scope of the government's obligations under Rule 16 and the Jencks Act. The government has represented that it has produced all materials required under the Jencks Act, as well as all materials covered by *Brady*. Nothing more is required. Defendant cites to a few cases from outside this Circuit that have required the production of non-witness statements. But the law, both generally and in this Circuit, is that in a non-capital case, neither the names of the

31

Appellate Case: 13-3253     Page: 117     Date Filed: 02/12/2014 Entry ID: 4123547

government's witnesses nor the statements of those individuals interviewed whom the government does not intend to call as witnesses are discoverable. *See United States v. Manthei*, 979 F.2d 124, 126 (8th Cir. 1992); *United States v. White*, 750 F.2d 726, 728 (8th Cir. 1984); *United States v. Pelton,* 578 F.2d 701, 708 (8th Cir. 1978); *United States v. Beale*, 2008 WL 7759975, at *1 (D. Minn. 2008); *see also United States v. Bros. Constr. Co.,* 219 F.3d 300, 316 (4th Cir. 2000).   No further production is required.

With respect to the request to retain rough notes, the Eighth Circuit has indicated that it is a preferable practice that rough notes be retained, irrespective of whether they might be discoverable by the defendant. *See United States v. Grunewald*, 987 F.2d 531, 535 (8th Cir. 1993); *United States v. Leisure*, 844 F.2d 1347, 1361 n.10 (8th Cir. 1988); *United States v. Hoppe*, 645 F.2d 630, 634 n.2 (8th Cir. 1981).   The government has directed such retention, and the rough notes have been reviewed for any potentially favorable material.   Defendant has made no showing, however, that the rough notes are required to be produced.   *See United States v. Wright*, 540 F.3d 833, 841-2 (8th Cir. 2008) (holding, agent interview notes are not "statements" required to be produced under Jencks Act); *United States v. Greatwalker*, 356 F.3d 908, 911-12 (8th Cir. 2004) (holding agents' handwritten notes not required to be produced under Jencks Act and noting production under *Brady* is required only if notes contain additional exculpatory information).

In paragraph 5, Defendant suggests that he does not believe that the government has fully complied with its *Brady* obligations.   The government has repeatedly stated that it has complied fully with its requirements under *Brady*, and Defendant's speculation to

32

116

the contrary based upon two earlier statements of counsel taken out of context, do not

establish otherwise. *See United States v. Bowie*, 618 F.3d 802, 818 (8th Cir. 2010).

In paragraph 7 Defendant requests that the government produce the tax returns for

Roy White for the years 2006 through 2010.  At the hearing Defendant stated that Mr.

White apparently signed off as Defendant's supervisor for some period of time relevant to

the indictment, and that Defendant wants the tax returns to determine whether Mr. White

worked "other jobs."  The government has already produced the witness's grand jury

testimony and the agent's summaries of his statements, and has represented that it does

not have Mr. White's tax returns.  What Defendant seeks is beyond the scope of what is

required to be produced.  The prosecution need only produce what is in its custody or

control, which does not include documents possessed by other agencies.  Further,

Defendant has not established any evidence, beyond sheer speculation, that the tax

returns will reflect any material information.  Nor has Defendant disclosed what, if any,

efforts he has made to obtain such returns from the witness.  For these reasons,

Defendant's request that the United States Attorney attempt to obtain Mr. White's tax

returns from the Internal Revenue Service shall be denied.

Finally, Defendant requests that the Assistant United States Attorney disclose the

names and summaries of information provided by all witnesses to whom the Assistant

United States Attorney spoke on or about October 17, 2012, in connection with counsel's

efforts to obtain more information about the status of the Treasurer's Office and the

Parking Division.  As set forth in the government's response, any such discussions

constitute attorney work product.  Based on the government's representation that no such

individuals provided any potentially exculpatory information, Defendant's request is denied.

Accordingly, for the reasons stated above and in my prior Order of October 15, 2012,

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss Counts 4-8 [Doc. No. 177] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motions to Dismiss Counts 2 and 3 [Doc. No. 183] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Bill of Particulars [Doc. No. 178] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Sever [Doc. Nos. 181] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Change of Venue [Doc. No. 180] is **DENIED** without prejudice.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress GPS Evidence [Doc. No. 179] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Amended *Jencks* Motion [Doc. No. 187] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion in Limine Requesting an In Camera Examination of Jencks Material that is Redacted [Doc. No. 129] is **GRANTED**, to the extent that the Court shall conduct such an examination.

Appellate Case: 13-3253   Page: 120   Date Filed: 02/12/2014 Entry ID: 4123547

**IT IS FURTHER ORDERED** that Defendant's Discovery Motion [Doc. No. 191] is **DENIED**.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 12th day of March, 2013.

119

Government of the City of St. Louis, Missouri

120

1  term, so he's been mayor for 12 years now.

2      Q.   As director of personnel for the city of

3  St. Louis, are you familiar with the laws regarding who is

4  and is not a City of St. Louis employee?

5      A.   I don't know if there would be laws, but I am

6  familiar with how we interpret who is and who is not an

7  employee.

8          MS. DRAGAN:  May I approach, Your Honor.

9          THE COURT:  You may.

10  BY MS. DRAGAN:

11     Q.   I just handed you what's been marked as

12  Defendant's Exhibit K, do you recognize that chart?

13     A.   Yes, I do.

14     Q.   And does that chart fairly and accurately

15  represent the government of the City of St. Louis; is it a

16  fair representation?

17     A.   Yes, I believe it does.

18          MS. DRAGAN:  Move for admission of Defendant's

19  Exhibit K.

20          MR. GOLDSMITH:  No objection, Your Honor.

21          THE COURT:  Exhibit K will be admitted.

22     Q.   I'm going to place it on the screen here in front

23  of you.  So, at the top of that we have the Citizens of

24  St. Louis, correct?

25     A.   Yes.

Appellate Case: 13-3253    Page: 123    Date Filed: 02/12/2014 Entry ID: 4123547

1     Q.   Then is Mayor Slay an employee of the City of

2  St. Louis?

3     A.   Yes, he is.

4     Q.   I'm going to mark the employees with an orange

5  marker.  And below Mayor Slay we see a line that goes down

6  and then a large section below that.  Are all of those

7  individuals departments and agencies, are they employees of

8  the City of St. Louis?

9     A.   Yes, they are.

10    Q.   I'll mark those all in orange.  What about the

11 comptroller's office, is that City of St. Louis

12 employees?

13    A.   Yes, it is.

14    Q.   Now, outside of the mayor, we see the recorder of

15 deeds, the circuit clerk, the sheriffs, the circuit

16 attorney; you see those black boxes?

17    A.   Yes, I do.

18    Q.   What are those government agencies, are they city

19 or are they county agencies?

20    A.   The city of St. Louis is a city that is not

21 within a county, so those are actual county offices.

22    Q.   I'll mark all of those with green for county.  On

23 the far side we see the collector of revenue, license

24 collector, treasurer, and public administrator.  Are those

25 also considered county offices?

Appellate Case: 13-3253    Page: 124    Date Filed: 02/12/2014 Entry ID: 4123547

         A.   Considered county offices with the provisions

    that several of them are also established by statute,

    specifically we refer to them as the fee offices.  So,

    there's some statutory regulation involved in their offices

    as well.

         Q.   I'll mark the rest of these green as county.

    Now, you mentioned fee offices and at the bottom of our

    chart it says "a star indicates a fee office"; do you see

    that?

         A.   I apologize to the jury, I lost a contact lens

    today, so I'll stick this up close to my face.  Yes, I do

    see that.

         Q.   The fee offices that are on this chart are the

    collector of revenue, the license collector and public

    administrator, correct?

         A.   That's correct.

         Q.   And there's one fee office that is missing from

    this chart, correct?

         A.   Yes, that's true.

         Q.   What is that office that is missing from the

    chart?

         A.   That would be the parking division component of

    the Treasurer's Office.

         Q.   So that is a separate fee office that's not shown

    on this chart?

Appellate Case: 13-3253     Page: 125     Date Filed: 02/12/2014 Entry ID: 4123547

1   A. Separate in the sense it's not distinguished in

2 the treasurer's box.

3   Q. So, it would be appropriate to have another box

4 over here that has the parking division in it?

5   A. That's correct.

6   Q. And also I'm going to put a star on it like the

7 rest of them, that's also a fee office?

8   A. Yes, ma'am.

9   Q. What's the distinction between the fee offices

10 and other county offices?

11   A. Well, again they are established by state

12 statute. They generate their own funds, so while their

13 budget is not reviewed by the board of estimate and

14 apportionment which is, as you can see here, is the

15 controlling fiscal body for the City of St. Louis, nor does

16 the budget director review and approve their budget.

17   Q. There is a budget director on here. Is he a city

18 of St. Louis employee?

19   A. Yes, he is.

20   Q. I'll mark him in orange. What about the Board of

21 Aldermen, are they considered City of St. Louis or do they

22 have their own special designation?

23   A. They have their own special designation being

24 legislators. However, I will say that three of their

25 positions, the chief of staff, and two administrative

Appellate Case: 13-3253  Page: 126  Date Filed: 02/12/2014 Entry ID: 4123547

1    positions are in our classified service which is our

2    compensation ordinance that establishes the legal basis for

3    paying city employees, and therefore they are considered

4    city employees.

5        Q.   Off to the left under the box called Governor of

6    Missouri, would you call those state offices?

7        A.   Yes, ma'am.

8        Q.   I'll leave those alone for right now.  Now, all

9    of these offices in the black boxes, they are all

10   independently elected offices?

11       A.   Yes.

12       Q.   And they do all share certain things, correct?

13       A.   Yes, they do.

14       Q.   So everybody along this line shares payroll, for

15   instance?

16       A.   That's correct.

17       Q.   So all of those independent government agencies

18   submit payroll to the same place?

19       A.   That's correct.

20       Q.   Because they submit payroll to the same place,

21   they all get a payroll check that reads the same; is that

22   fair?

23       A.   That's correct.

24       Q.   Do all those payroll checks read City of

25   St. Louis?

Appellate Case: 13-3253     Page: 127     Date Filed: 02/12/2014 Entry ID: 4123547

1  question.

2          THE COURT:  I understand.  You've said that three

3  or four times.  We are done.

4          (THE FOLLOWING PROCEEDINGS CONTINUED WITHIN THE

5  HEARING OF THE JURY:)

6  BY MR. GOLDSMITH:

7      Q.  Sir, we've asked quite a few questions about

8  whether specifically the defendant was authorized to act on

9  behalf of the City of St. Louis.  As the Director of

10 Personnel for the City of St. Louis, how would you define

11 agency, who an agent is?

12     A.  An agent is someone who works on behalf of

13 someone, for some entity.

14     Q.  Would that include someone who is authorized to

15 act on behalf of that entity?

16     A.  Yes.

17     Q.  And if the defendant was an hourly employee of

18 the parking division from 2006 to 2010, would you have

19 considered him an agent of the City of St. Louis?

20         MS. DRAGAN:  Object, Your Honor.

21         THE COURT:  I've heard the objection.  It is

22 overruled.

23     A.  Yes, I would.

24         MR. GOLDSMITH:  Thank you.  Nothing further, Your

25 Honor.

126

 1      Q.    You talked about all of these groups here across

 2   the yellow, it's a group benefit plan that any of those

 3   independent government agencies can share in?

 4      A.    That's correct.

 5      Q.    And there were a lot of questions about workers'

 6   compensation if an injury occurred to Mr. Robinson, you are

 7   not aware of any workers' compensation claims ever being

 8   filed by Mr. Robinson, correct?

 9      A.    No,  I'm not aware.

10      Q.    And you talked about each of these different

11   agencies and, for instance, the police department working

12   on behalf of the City of St. Louis?

13      A.    Yes.

14      Q.    You talked about each of these, the circuit

15   attorneys and the circuit clerks all working on behalf of

16   the City of St. Louis?

17      A.    Yes.

18      Q.    When you're talking City of St. Louis in that

19   term you are talking the boundary and all the citizens

20   encompassed in the City of St. Louis, correct?

21      A.    That is correct.

22      Q.    You're not actually talking about the mayor,

23   correct?

24      A.    No. I'm not.

25            MS. DRAGAN:  Nothing further.

127

of this case, as Judge Fleissig has instructed you, and I
want you to look at Instruction Number 17.  This governs
Count Four, but you have a similar instruction for Counts
Four, Five, Six, Seven, and Eight, the City of St. Louis
counts.  This is, these are the four elements that Judge
Fleissig has instructed you the Government has to prove in
order for you to convict this defendant of these five
counts, nothing more, nothing less; these four counts, or
these four elements.

One, the defendant was an agent of the City of
St. Louis.  Folks, the uncontroverted evidence in this
case, the only evidence you heard on that point was from
the director of personnel from the very City of St. Louis
we're talking about, Mr. Frank.  And he said without any
qualification, this defendant Fred Robinson is an hourly
employee of the parking division of the Treasurer's Office
of the City of St. Louis, is an agent of the City of
St. Louis.  He is authorized to act on behalf of the City
of St. Louis.  Not just geographically; I mean, obviously
geographically, he works within the city, but he told you
the defendant was a public servant, he serves the City of
St. Louis, the people of the City of St. Louis, and that
testimony proves beyond any reasonable doubt that first
element.  No question, defendant was an agent of the City
of St. Louis.  And if you go down below a little bit, talks

Appellate Case: 13-3253   Page: 130   Date Filed: 02/12/2014 Entry ID: 4123547

1

A.   Yes.

Q. The device, however, tracked Mr. Robinson even at periods of time when he was not scheduled, to your knowledge, to be at work, is that correct?

A.   At that time, we did not know specifically what his hours of employment were supposed to be. We had heard from some individuals that there was night hours worked, so at that time, we did not know when he was supposed to be performing his job.

Q.   So you maintained and retained this data that was transmitted whenever it was transmitted, regardless of whether or not he was scheduled to be at work, because you didn't have an idea as to, or knowledge of when he was scheduled to be at work?

A.   Can you repeat that please?

Q.   That was kind of a bad question. You kept the data that was transmitted, and you sought the data for periods of time even when you thought maybe he wasn't -- you didn't know he was working or not working, scheduled to be working or not working. You sought data I guess 24 hours a day if possible, is that correct?

A.   Yes.

Q.   And he was not scheduled to work 24 hours a day?

A.   No, we didn't know what his work schedule was.

Q.   Now, you retained that information, is that correct? It wasn't a transient type of information. That data was stored and kept?

A.   Yes.

Q.   And in fact, prior to the attaching of the device to the vehicle, there was no warrant obtained by -- your agency did not seek a warrant to place this device on the vehicle?

A.   No.

129

Appellate Case: 13-3253   Page: 131   Date Filed: 02/12/2014 Entry ID: 4123547

Q.   And while it was on the vehicle, there was never an attempt to obtain a warrant for the placement of the item on the vehicle while it was in place?

A.   No.

Q.   Were you examining the data that was transmitted while it was on the vehicle?

A.   You mean during that two-month time period?

Q.   Yes, were you examining and analyzing that data while it was on the vehicle itself?

A.   I was reviewing it.

Q.   Reviewing it. And were you using it in your investigation at that time? When I say using it, were you discussing it with other agents? Were you trying to corroborate as you did before that tracking data with interviews or any other visual surveillance?

A.   At that time, I think I was more focused just on collecting the information. I did more of the corroboration afterwards, after the tracker was finished.

MS. JONES: Okay, I don't think I have any further questions, Your Honor.

THE COURT: Redirect?

MR. GOLDSMITH: Just briefly, Judge.

REDIRECT EXAMINATION

BY MR. GOLDSMITH:

Q.   Agent Comeau, just so the record is clear, you had -- you and your investigative agents had not reviewed, actually received or reviewed any of the defendant's time sheets that he had submitted to the St. Louis Treasurer's Office prior to this period of time that the GPS tracker was on his vehicle, correct?

A.   No, we did not review those time sheets. We did not have

130

INSTRUCTION NO.

For an individual to be an "agent" of the City of St. Louis, that individual must be authorized to act on behalf of the City of St. Louis with respect to its funds.

*United States v. Whitfield*, 590 F.3d 325, 345 (5th Cir. 2009), *aff'd after re-sentencing sub nom.*
*United States v. Teel,* 691 F.3d 578 (5th Cir. 2012).

Def. Prop. C

131

INSTRUCTION NO. ___

If you find that Mr. Robinson was not an agent of the agency that received the federal funds, the Department of Human Services, you must find him not guilty.

*Def. Proposed D*

Alternate Instruction

If you find that Mr. Robinson was not an agent of the agency that received the federal funds, you must find him not guilty.

*Def. Proposed E*

*United States v. Phillips*, 219 F.3d 404, 412-414 (5th Cir. 2000); *United States v. Brunshtein*, 344 F.3d 91, 98-99 (2d Cir. 2003).

132

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

No. 13-3253

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff-Appellee, | ) Appeal from the United |
| | ) States District Court |
| vs. | ) for the Eastern District |
| | ) of Missouri |
| FRED ROBINSON | ) |
| | ) No. 4:11 CR 361 AGF |
| Defendant-Appellant. | ) |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 10, 2014, a true copy of Defendant-Appellant's Addendum to Brief was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the Office of the United States Attorney for the Eastern District of Missouri.

Respectfully submitted,

/s/ Diane L. Dragan
DIANE L. DRAGAN
Assistant Federal Public Defender
1010 Market Street, Suite 200
St. Louis, Missouri 63101
E-mail: Diane_Dragan@fd.org
ATTORNEY FOR DEFENDANT-APPELLANT